*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0163p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KEVIN MURRAY,

             *Plaintiff-Appellant,*

     *v.*

UNITED STATES DEPARTMENT OF TREASURY;
FEDERAL RESERVE SYSTEM BOARD OF
GOVERNORS OF THE FEDERAL RESERVE,

             *Defendants-Appellees.*

No. 11-1063

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 2:08-cv-15147—Lawrence P. Zatkoff, District Judge.
>
> Argued: April 20, 2012
>
> Decided and Filed: June 1, 2012
>
> Before: NORRIS, CLAY, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Robert J. Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellant. Lowell V. Sturgill, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Robert J. Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, David Yerushalmi, LAW OFFICE OF DAVID YERUSHALMI, P.C., Chandler, Arizona, for Appellant. Lowell V. Sturgill, Jr., Mark Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Jerome M. Marcus, MARCUS & AUERBACH, LLC, Jenkintown, Pennsylvania, Andrew O. Bunn, DLA PIPER LLP, Florham Park, New Jersey, for Amici Curiae.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.  Plaintiff Kevin Murray appeals a judgment in favor of Defendants United States Department of Treasury ("Treasury Department") and the Board of Governors of the Federal Reserve System ("Board of Governors") on his Establishment Clause Claim.  Plaintiff alleges that the Treasury Department violated the First Amendment's Establishment Clause by committing federal dollars to American International Group, Inc. ("AIG"), whose subsidiaries market and sell Sharia-compliant financing products.  The district court granted summary judgment in favor of Defendants on the merits.  We **AFFIRM** the district court's judgment, though on the alternative ground that Plaintiff lacks standing.

**FACTUAL BACKGROUND**

Before Defendants obtained a controlling stake in AIG following the 2008 financial crisis, certain AIG subsidiaries began selling Sharia-compliant financing ("SCF") products.  The term "Sharia" refers to Islamic law based on the teachings of the Quran.[1]  It is the Islamic code embodying the way of life for Muslims and is intended to serve as the civic law in Muslim countries.  SCF insurance and financial products are designed to comply with Sharia law.  For example, managers of an SCF product use a portion of the product's reserves to fulfill the Islamic duty of charitable giving and do not invest premiums in industries dealing with pork, alcohol, interest, gambling, or pornography.[2]  AIG subsidiaries ensure the Sharia-compliance of its SCF products by

_____

[1] "Sharia" may be spelled "Sharia," "Shariah," "Shari'a," and "Shari'ah," but we adopt the spelling "Sharia" for purposes of this opinion.

[2] By way of example, one SCF product is the "Takaful Homeowners Policy" marketed by AIG subsidiary Lexington Life Insurance Company.  "Takaful" is an Islamic insurance concept; a Sharia adherent may buy a Takaful policy, such as one sold by an AIG subsidiary, because it segregates policyholder contributions and assets held by the policy-issuing subsidiary, invests no money in any venture prohibited by Sharia, disburses a share of any net surplus derived from premiums to charitable organizations, and prohibits the use of policyholder funds to enter into financial transactions prohibited by Sharia law.

obtaining consultation from "Sharia Supervisory Committees." The members of these committees are authorities in Sharia law and oversee the implementation of SCF products by reviewing AIG's operations, supervising the development of SCF products, and evaluating the compliance of these products with Sharia law.

AIG is a holding company for roughly 290 direct and indirect subsidiaries around the world. All of AIG's subsidiaries retain corporate formalities separate from AIG. AIG's financial statements are consolidated among AIG, its wholly-owned subsidiaries, and a proportional share of the net incomes of subsidiaries significantly controlled by AIG. The six AIG subsidiaries at issue in this case are consolidated in AIG's financial statements.[3] AIG's subsidiaries received a significant portion of the funds AIG received from the federal government. Six AIG subsidiaries have marketed and sold SCF products since AIG began receiving capital injections from the federal government, but AIG itself has not.

Defendant Treasury Department obtained its stake in AIG in a two-phase process. First, the Federal Reserve Bank of New York ("FRBNY") lent AIG $85 billion in September 2008. In exchange, AIG issued shares that were held in trust for the benefit of the Treasury Department. Second, the Treasury Department took a partial ownership stake in AIG by committing $40 billion pursuant to the Troubled Asset Relief Program ("TARP"). The Emergency Economic Stabilization Act of 2008 ("EESA"), 12 U.S.C. §§ 5201–61, gave the Treasury Secretary the power "to establish [TARP] to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions" set by him. 12 U.S.C. § 5211(a)(1). The EESA defines a "troubled asset" as a "financial instrument . . . the purchase of which is necessary to promote financial market stability." 12 U.S.C. § 5202(9)(B). It requires the Treasury Secretary to exercise his authority under TARP only after considering several goals, such as protecting taxpayer interests, providing market stability in order to protect American jobs and savings, and ensuring the eligibility of all

---

[3]Those AIG subsidiaries are Lexington Insurance Company; A.I. Risk Specialists Insurance, Inc.; Chartis Takaful-Enaya B.S.C. (c); the Saudi Arabia branch office of American Life Insurance Company; AIA Takaful International, Bhd.; and PT. AIA Financial.

financial institutions regardless of size or type.  12 U.S.C. § 5213.  In November 2008, the Treasury Secretary used his TARP authority to buy $40 billion worth of AIG preferred stock.  Then, prompted by AIG's significant losses in the fourth quarter of 2008, the Treasury Department made another capital commitment to AIG in April 2009, this time in the amount of $30 billion, in exchange for more shares of AIG preferred stock.  In September 2010, AIG, the Treasury Department, the FRBNY, and other parties announced their intention to enter into a series of agreements aimed at recapitalizing AIG, repaying taxpayer funds, and returning AIG to financial independence.

In December 2008, Plaintiff lodged an as-applied challenge to the EESA, arguing that it violated the Establishment Clause of the First Amendment for the government to allow a portion of the capital commitment given to AIG to support the marketing of SCF products.  Plaintiff sought a declaratory judgment and permanent injunction prohibiting Defendants from using taxpayer funds to support the sale of SCF products.  According to Plaintiff, SCF products are a form of religious indoctrination, and he contends that the Treasury Department actively promoted the marketing of SCF products in addition to funding AIG subsidiaries that marketed them.  Neither party disputes that Treasury Department financing supported all of AIG's business, including the subsidiaries that marketed SCF products.  Plaintiff contends that AIG disbursed $153 million to two subsidiaries that marketed and sold SCF products, though Defendants dispute whether EESA funds were used for those disbursements.

Plaintiff is a Michigan resident, a Marine veteran of Operation Iraqi Freedom, a devout Catholic, and a federal taxpayer.  His status as a federal taxpayer is the sole basis of his asserted standing to challenge the EESA's application.  Plaintiff alleges that Defendants' support of AIG harms him by supporting the sale of SCF products.  The sale of SCF products allegedly harms him by promoting Sharia law, which his complaint contends "forms the basis for the global jihadist war against the West and the United States" and "sends a message to Plaintiff, who is a non-adherent to Islam, that he is an outsider."  (Am. Compl. ¶ 15, R. 45.)

Defendants moved to dismiss the complaint on the grounds that Plaintiff lacked standing and failed to state a claim, but the district court denied the motion. The parties completed discovery and filed cross-motions for summary judgment in June 2010. Concluding that the Treasury Department's disbursements to AIG did not violate the Establishment Clause, the district court denied Plaintiff's motion for summary judgment and granted that of Defendants.

## DISCUSSION

On appeal, Defendants re-assert their challenge to Plaintiff's standing, and that challenge is well-taken. Recent cases from the Supreme Court and this Circuit make it clear that Plaintiff lacks standing to bring this Establishment Clause challenge.

We review a district court's decision regarding a plaintiff's Article III standing *de novo*. *Schultz v. United States*, 529 F.3d 343, 349 (6th Cir. 2008). We look to the complaint and any accompanying materials in deciding standing questions. *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 729 (6th Cir. 2009).

Article III of the Constitution gives federal courts subject matter jurisdiction over actual cases or controversies, neither of which exists unless a plaintiff establishes his standing to sue. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989); *Allen v. Wright*, 468 U.S. 737, 750 (1984); *see* U.S. Const. art. III § 2. Because federal courts "sit 'solely . . . to decide on the rights of individuals,'" *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 598 (2007) (quoting *Marbury v. Madison*, 1 Cranch 137, 170 (1803)), standing is "the threshold question in every federal case." *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). The "well established" law of Article III standing requires a plaintiff to "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Hein*, 551 U.S. at 598 (quoting *Allen*, 468 U.S. at 751).

Our inquiry into a plaintiff's standing is "especially important" where the plaintiff contests the constitutionality of a generally applicable statute allegedly causing

him "injury . . . not distinct from that suffered in general by other taxpayers or citizens." *Id.* (quoting *ASARCO*, 490 U.S. at 613). A plaintiff's status as a federal taxpayer generally "does not give rise to the kind of redressable 'personal injury' required for Article III standing," *id.* at 599, and indeed taxpayer standing has been "long-disfavored" as a basis for federal jurisdiction over a challenge to a federal appropriation. *Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 284 (6th Cir. 2009). The reason for the disfavor lies in the proposition that a taxpayer's interest in the disbursement of federal appropriations is "too generalized and attenuated" to establish a "particularized injury" to the taxpayer-plaintiff. *Hein*, 551 U.S. at 599–600; *see Frothingham v. Mellon*, 262 U.S. 447, 487 (1923) (describing the injury suffered by a federal taxpayer as a result of government spending as "comparatively minute and indeterminable").

The Supreme Court recognized a "narrow exception" to the prohibition on taxpayer standing in *Flast v. Cohen*, 392 U.S. 83 (1968). In *Flast*, the taxpayer-plaintiffs raised an Establishment Clause challenge to the disbursement of funds to religious schools under the Elementary and Secondary Education Act of 1965, citing their status as taxpayers as the sole basis for their standing. *Id.* at 85–86. In concluding that the taxpayer-plaintiffs had standing to challenge the disbursements, the Court used a two-part test:

> First, the taxpayer must establish *a logical link between that status and the type of legislative enactment attacked*. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, [§] 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. . . . Secondly, the taxpayer must establish *a nexus between that status and the precise nature of the constitutional infringement alleged*. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, [§] 8.

*Id.* at 102–03 (emphasis added).  The taxpayer-plaintiffs in *Flast* satisfied the first condition by challenging a congressional spending statute adopted pursuant to Article I, § 8, of the Constitution.  *Id.* at 103.  They satisfied the second condition by alleging that the disbursements violated the Establishment Clause, which "operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, [§] 8."  *Id.* at 104.

The Supreme Court again concluded that taxpayer-plaintiffs had standing to assert an Establishment Clause challenge to a congressional appropriation in *Bowen v. Kendrick*, 487 U.S. 589 (1988).  In *Kendrick*, the taxpayer-plaintiffs challenged certain appropriations made pursuant to the Adolescent Family Life Act ("AFLA"), 42 U.S.C. §§ 300z–z-10, and disbursed by the Secretary of Health and Human Services.  *Id.* at 593–94.  The AFLA provided grants to public and non-profit organizations to fund programs aimed at reducing the rate of unmarried adolescent pregnancy, and Congress expressly directed that program disbursements should "make use of support systems such as . . . . religious and charitable organizations."  *Id.* at 596 (quoting 42 U.S.C. § 300z-2).  The Court concluded that the taxpayer-plaintiffs demonstrated a nexus between their taxpayer status and Congress's exercise of its taxing and spending power, reasoning that the taxpayer-plaintiffs' claims "call[ed] into question how the funds authorized by Congress are being disbursed pursuant to the AFLA's statutory mandate."  *Id.* at 620.

The Supreme Court clarified the requirements for taxpayer standing in *Hein v. Freedom from Religion Foundation, Inc.*  In *Hein*, taxpayer-plaintiffs challenged executive orders establishing the White House Office of Faith-Based and Community Initiatives within the Executive Office of the President, as well as similar offices in other federal agencies, arguing that they violated the Establishment Clause.  *Hein*, 551 U.S. at 593–94 (Alito, J., plurality opinion).  Congress did not authorize the creation of the offices with legislation; rather, the offices were created by executive orders and funded by "general Executive Branch appropriations."  *Id.* at 595.

The Court concluded that the taxpayer-plaintiffs lacked standing to challenge the executive orders. *Id.* at 608–09. According to the Court, in order to obtain standing, taxpayer-plaintiffs must demonstrate their standing by alleging an "Establishment Clause violation . . . funded by a specific congressional appropriation and . . . undertaken pursuant to an express congressional mandate." *Id.* at 604. The taxpayer-plaintiffs' challenge in *Hein* was directed instead toward a different kind of government action, the Court explained: the challenged "appropriations did not expressly authorize, direct, or even mention the expenditures of which respondents complain"; rather, "[t]hose expenditures resulted from executive discretion, not congressional action." *Id.* at 605. Because the taxpayer-plaintiffs challenged a disbursement not "funded by a specific congressional appropriation" and not "undertaken pursuant to an express congressional mandate," the Court concluded the taxpayer-plaintiffs lacked standing.[4] *Id.* at 604.

Two portions of *Hein* are noteworthy. First, the *Hein* Court recast the factual underpinning of *Flast*. The legislation at issue in *Flast* expressly permitted disbursements to private schools but made no specific reference to disbursement to religious schools. *See id.* at 604. The Court noted, however, that "the great majority of nonpublic elementary and secondary schools in the United States were associated with a church" at the time of *Flast*. *Id.* at 604 n.3. That fact led the Court to conclude that "Congress surely understood that much of the aid mandated by the statute would find its way to religious schools." *Id.* Thus, while the *Hein* Court explained that "the *Flast* exception has largely been confined to its facts" in the decades since it was decided, *Hein*'s analysis of those facts was arguably different than that of the *Flast* Court itself. *Id.* at 609.

Second, in surveying *Kendrick*, the Court emphasized the fact that the AFLA's text raised the possibility that AFLA funds could be disbursed to religious groups. Noting that the AFLA expressly referred to religious organizations as possible recipients

---

[4]Justices Scalia and Thomas concurred separately from the four-Justice plurality and argued that the Court should overrule *Flast*. *See Hein*, 551 U.S. at 618 (Scalia, J., concurring in judgment). The plurality opinion's narrower basis for concluding that the taxpayer-plaintiffs lacked standing controls our decision. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 n.9 (1988).

of federal funding, the *Hein* Court repeated *Kendrick*'s conclusion that the "claims 'called into question how the funds authorized by Congress were being disbursed *pursuant to the AFLA's statutory mandate*.'" *Id.* at 607 (quoting *Kendrick*, 487 U.S. at 619–20) (emphasis in *Hein*). The *Hein* Court described *Kendrick* as "involv[ing] a 'program of disbursement of funds pursuant to Congress' taxing and spending powers' that 'Congress had created,' 'authorized,' and 'mandated.'" *Id.* (quoting *Kendrick*, 487 U.S. at 619–20).

In these two portions of *Hein*, the Supreme Court expressly linked the appropriations at issue in *Flast* and *Kendrick* to congressional intention that the funds would be disbursed to religious groups. In so doing, the *Hein* Court indicated that a taxpayer-plaintiff had standing to raise an Establishment Clause challenge to an executive branch disbursement only where the statute "expressly contemplate[s] that some of those moneys might go to projects involving religious groups."[5] *Id.*

Our application of *Hein* has been consistent with this requirement. In *Pedreira v. Kentucky Baptist Homes for Children, Inc.*, taxpayer-plaintiffs alleged that two Kentucky cabinet secretaries violated the Establishment Clause by disbursing Social Security funds to a Baptist ministry. *Pedreira*, 579 F.3d at 724–25, 730; *see* 42 U.S.C. §§ 670-679b, 1381-1383f. The statutory scheme at issue authorized state officials "to provide foster care and maintenance for children." *Pedreira*, 579 F.3d at 730. We described the provisions authorizing the disbursements as "general funding provisions for childcare" that did "not contemplate religious indoctrination." *Id.* at 731. We concluded that the taxpayer-plaintiffs lacked standing to raise their Establishment Clause challenge, reasoning that the taxpayer-plaintiffs "failed to explain how these programs are related to the alleged constitutional violation." *Id.* at 730–31. Therefore, the

---

[5]A potential source of confusion lies in the fact that the *Hein* Court claimed to "leave *Flast* as [the Court] found it." *Id.* at 615 ("We do not extend *Flast*, but we also do not overrule it. We leave *Flast* as we found it."). Whether or not *Hein* contains a literal reading of *Flast*, *Hein*'s construction of *Flast*—in other words, the scope of taxpayer standing the *Hein* court "found" *Flast* to have fixed—is binding on lower courts. *See Am. Civil Liberties Union of Ky. v. McCreary Cty., Ky.*, 607 F.3d 439, 447 (6th Cir. 2010) ("Lower courts are 'obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale.'" (quoting *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002)).

plaintiffs' claims were "too attenuated to form a sufficient nexus between the legislation and the alleged violations." *Id.* at 731.

We expressed the same understanding of *Hein* in *American Atheists, Inc. v. City of Detroit Downtown Development Authority*. In the course of evaluating an Establishment Clause challenge to a municipal grant program, we stated that *Hein* "explained that the *Flast* exception does not extend to suits challenging executive-branch expenditures of unearmarked funds." *Am. Atheists*, 567 F.3d at 286. Though this statement was not essential to our disposition in *American Atheists*, it reflects our understanding that a taxpayer-plaintiff has standing to challenge an executive-branch disbursement of funds only if the appropriating statute expressly contemplates the disbursement of federal funds to support religious groups or activities.

The EESA does not contemplate the disbursement of congressional appropriations to support religious activities. Congress articulated the following goals in adopting the EESA:

> to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States . . . in a manner that (A) protects home values, college funds, retirement accounts, and life savings; (B) preserves homeownership and promotes jobs and economic growth; (C) maximizes overall returns to the taxpayers of the United States; and (D) provides public accountability for the exercise of such authority.

12 U.S.C. § 5201. The EESA aims to accomplish these goals by giving the Treasury Secretary authority to create TARP, which allows him "to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution." 12 U.S.C. § 5211(a)(1). The EESA requires the Treasury Secretary to take several goals into consideration when he administers TARP, including "protecting the interests of taxpayers," "providing stability and preventing disruption to financial markets in order to limit the impact on the economy and protect American jobs, savings, and retirement security," and "ensuring that all financial institutions are eligible to participate in the program." 12 U.S.C. § 5213.

Nothing about these stated goals, nor any other portion of the EESA that Plaintiff brings to our attention, "expressly contemplate[s] that some [federal funding] might go to projects involving religious groups," or otherwise indicates Congress' expectation that TARP funds would support religious programs. *Hein*, 551 U.S. at 607. Without any such indication, Plaintiff stands in the same position as the taxpayer-plaintiffs in *Hein*, who challenged "expenditures result[ing] from executive discretion, not congressional action." *Id.* at 605.

Attempting to convince us that the EESA contemplates support for religious activities, Plaintiff contends that Congress expected the Treasury Secretary to use TARP funds to fund the sale of SCF products. *See id.* at 604 n.3 (noting that "the great majority of nonpublic elementary and secondary schools in the United States were associated with a church" at the time of *Flast* and concluding that "Congress surely understood that much of the aid mandated by the statute would find its way to religious schools"). Plaintiff offers evidence of several activities undertaken by government policymakers aimed at familiarizing themselves with Islamic finance. For example, in December 2008, shortly after the Treasury Department acquired an interest in AIG, the department sponsored a conference entitled "Islamic Finance 101." The stated purpose of the conference was to provide government policymakers information about Islamic finance. The presentation materials from the conference discussed topics such as the source of Islamic finance, how Islamic finance works, and the market factors that caused its growth. On the basis of activities such as "Islamic Finance 101," Plaintiff invites us to adopt the "reasonable inference" that Congress knew EESA appropriations "would support AIG's operations, including its religious activities[,] since AIG was well known as the leader in SCF." (Reply Br. 14.)

We find no basis for accepting that invitation. Plaintiff's evidence—a few scattered bureaucratic activities intended to inform policymakers about a subject relevant to their regulatory responsibilities that happened to have a religious nexus—is unconvincing, to say the least. It falls well short of supporting a reasonable inference of congressional intention that a portion of the EESA's vast appropriations might support

the marketing of a minor portion of the business of AIG subsidiaries.  Plaintiff has failed to demonstrate that Congress "understood that much of the aid mandated by the [EESA] would find its way" to fund SCF products.  *Hein*, 551 U.S. at 604 n.3.

Plaintiff also argues that the as-applied posture of his challenge to the EESA gives him standing, but the posture of his challenge is irrelevant to our standing inquiry.  According to Plaintiff, he does not challenge the EESA, *per se*, but rather the Treasury Secretary's decision to disburse EESA funds to businesses that may have used the money to support the marketing and sale of SCF products.  That disbursement, in Plaintiff's opinion, provides the nexus between his status as a taxpayer and an alleged Establishment Clause violation.

*Hein* squarely prohibits this argument.  There, the general congressional appropriations that funded the executive orders subject to the Establishment Clause challenge did not indicate a congressional understanding that the money might be used for a religious purpose.  *Hein*, 551 U.S. at 593–94.  It was only through "executive discretion" that the congressional appropriations were used for arguably religious purposes.  *Id.* at 605.  The taxpayer-plaintiff lacked standing under those circumstances, which were identical in all relevant respects to those presented by Plaintiff's challenge to the EESA.  Neither the EESA nor any reasonable inference from its historical context suggest that Congress knew, or much less intended, that TARP funds might support the marketing and sales of SCF products.  It was only through executive discretion that TARP funds were transferred to AIG and, in turn, its subsidiaries.  Because the EESA does not contemplate the use of federal funds to support religious activities, Plaintiff lacks standing.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment on a separate basis supported by the record.  *Blount-Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011).