RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0139p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

IMHOFF INVESTMENT, L.L.C.,

*Plaintiff,*

AVIO, INC., a Michigan corporation, individually and as the representative of a class of similarly situated persons,

*Plaintiff-Appellant,*

No. 14-1704

*v.*

ALFOCCINO, INC.; D. TALIERCIO INVESTMENTS, INC.; FARSHID SHUSHTARI,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-10221—Gerald E. Rosen, Chief District Judge.

Decided and Filed:  July 7, 2015

Before:  SILER, MOORE, and STRANCH, Circuit Judges.

———————————

**COUNSEL**

**ON BRIEF:**  Phillip A. Bock, BOCK & HATCH, LLC, Chicago, Illinois, for Appellant.  John R. Prew, Jason R. Mathers, HARVEY KRUSE, P.C., Troy, Michigan, for Appellees.

—————————

**OPINION**

—————————

JANE B. STRANCH, Circuit Judge.    Plaintiff Avio, Inc.[1] alleges that Defendant Alfoccino violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227(b)(1)(C), (b)(3), by hiring Business to Business Solutions (B2B) to send unsolicited facsimile advertisements to Avio and a class of similarly situated persons.    The district court granted Alfoccino's motion for summary judgment, dismissing Avio's case for lack of Article III standing.    It also found—as a second, independent basis for granting Alfoccino's motion—that Avio could not prove Alfoccino was vicariously liable for B2B's transmission of the faxes. Because Avio has demonstrated that it does have Article III standing to bring its claim, and because the pertinent FCC regulations indicate that primary, not vicarious liability attaches to Alfoccino under the TCPA, we REVERSE the district court's order granting summary judgment for Alfoccino and REMAND the case to the district court for further proceedings.

## I.  BACKGROUND

B2B was one of several company names used by Caroline Abraham, who in 2006 conducted fax broadcasting operations for multiple clients.    B2B maintained a hard drive that documented thousands of fax transmissions successfully sent on behalf of Alfoccino and other businesses.    B2B had obtained the numbers used in the broadcast two years earlier from a company called InfoUSA.    Abraham testified that she believed it was legal to send fax advertising to companies that had an established business relationship with the sender and mistakenly thought the companies on the InfoUSA list met that standard.    Abraham did not call the businesses on her fax lists to seek consent to send them fax advertisements.

Alfoccino is a restaurant business with two locations.    It is operated by brothers Farshid "Tony" Shushtari and Frank Shushtari.    Alfoccino, Tony, and an entity that is a part owner of

---

[1]Imhoff Investment, L.L.C. was the original named plaintiff in this case.  In May 2012, Plaintiff Imhoff and Intervenor Avio filed a motion to intervene/substitute a new class representative, voluntarily dismiss Imhoff, and file an amended complaint.  The district court granted the motion and in August 2012 Avio filed its First Amended Class Action Complaint, naming itself as plaintiff and class representative.

Alfoccino, Taliercio Investments, Inc., are named defendants here. Tony was responsible for Alfoccino's marketing and advertising and was the only person from Alfoccino who communicated with B2B. He regularly hired a company named Value Fax to conduct fax advertising for the restaurants, but hired other companies, including B2B, to fax his advertisements "once or twice" as well. In 2006, Tony hired B2B because they did bulk faxing and cost less than Value Fax had. He directed B2B to send out 20,000 faxes to local businesses on behalf of the two Alfoccino restaurants. The ads he sent out with B2B were identical to the ads he had previously sent out with Value Fax.

Tony stated that Value Fax told him it obtained permission from its fax recipients before sending them ads, and that he had assumed that any company sending out faxes on his behalf would have done the same thing because "I assume that . . . if you're doing business you're doing it the right way. I didn't know. I was naïve maybe." He said that he did not knowingly authorize any fax advertisement that violated the law, and that he would not have authorized the ads had he known they violated the law. Tony, however, did not testify that he instructed B2B to send the ads only to people who had given prior permission to receive them, and none of Tony's written instructions to B2B in the record mention compliance with the law. None of the documents B2B produced include a representation about the legality of B2B's practices or a statement that B2B had obtained prior permission from its targets.

B2B's computer files contain copies of the documents faxed back and forth between Alfoccino and B2B and the final version of the Alfoccino ads that were sent. They also contain logs listing the fax numbers targeted, the time, date, and duration of each transmission, and whether each was successfully completed. According to Avio's expert, Robert Biggerstaff, B2B's fax logs show that Alfoccino's advertisements were successfully sent 13,980 times to 7,625 unique fax numbers. The logs show that B2B faxed Alfoccino's ad to Avio on November 13, 2006 at 1:42 a.m. and again on December 4, at 8:40 p.m. The first transmission was three pages and the phone lines were connected for two minutes and three seconds. The second transmission was one page and the phone lines were connected for 33 seconds. Both transmissions were successfully completed.

Avio's representative, David Barnett, testified at deposition that he had no personal recollection of receiving Alfoccino's fax or of its substance, and that he could not remember what year it was sent, but that he would have been the person who got it off the fax machine. Though he testified that it was his practice to keep even junk faxes after having received them, he did not locate a physical copy of the Alfoccino ad.

The original plaintiff filed this action in January 2010. The case was dismissed for lack of subject matter jurisdiction over TCPA claims in July 2010, but on appeal this court reversed and remanded based on intervening circuit precedent holding that federal courts have subject matter jurisdiction over TCPA claims.[2] In 2013, Avio moved for class certification, seeking to establish a class of the more than 7,000 unique recipients of B2B's fax of the Alfoccino's ad. While that motion was pending, Alfoccino filed a motion for summary judgment, which was granted on May 9, 2014. The district court found that Avio lacked Article III standing to pursue its claim and, as a secondary basis for dismissal, that Alfoccino could only be held vicariously liable—not directly liable—under the statute, and Avio failed to offer sufficient evidence for a jury to find Alfoccino vicariously liable for the faxes B2B transmitted.

## II. ANALYSIS

### A. Article III Standing

Courts must resolve questions of subject matter jurisdiction before ruling on the merits of the claim. *Gross v. Hougland*, 712 F.2d 1034, 1036 (6th Cir. 1983). Where the plaintiff has no Article III standing to bring a case, jurisdiction is lacking and the court must dismiss it. *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 622 (6th Cir. 2000). To have Article III standing, a plaintiff must "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012). The alleged injury must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

---

[2]*Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 463-465 (6th Cir. 2010); *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 753 (2012) (resolving a circuit split and reaching the same conclusion as *Charvat*).

The TCPA prohibits the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C). It provides a private right of action, permitting plaintiffs to seek (1) to enjoin a violation of the Act; (2) to recover for actual monetary loss from such a violation or to receive $500, whichever is greater; or (3) both (1) and (2). 47 U.S.C. § 227(b)(3).

Though the TCPA does not expressly state who has a cause of action to sue under its provisions, its descriptions of the conduct it prohibits repeatedly refer to the "recipient" of the unsolicited fax, 47 U.S.C. §227(b)(1)(C),(b)(2)(D), and in enacting the TCPA, Congress noted that such fax advertising "is problematic" because it "shifts some of the costs of advertising from the sender to the recipient" and "occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." H.R. Rep. 102–317 at 10 (1991).

In the instant case, the district court ruled that Avio lacked Article III standing, noting that it "refuses to find that a plaintiff satisfies Article III's injury in fact requirement when all it knows about its alleged injury is based upon what someone else told it." *Avio, Inc. v. Alfoccino, Inc.*, 18 F. Supp. 3d 882, 891 (E.D. Mich. 2014). Sixth Circuit authority filed several months after the district court's opinion, however, points to the opposite conclusion: that plaintiff Avio, as the recipient of Alfoccino's unsolicited advertising faxes, does allege an injury sufficient to meet the requirement for Article III standing.

In *American Copper & Brass, Inc. v. Lake City Indus. Products, Inc.*, this court affirmed a district court decision granting class certification and ultimately summary judgment to a class of plaintiffs who had received junk fax advertisements that B2B transmitted on behalf of the defendant, Lake City. 757 F.3d 540, 542 (6th Cir. 2014). The pertinent facts in *American Copper* are virtually identical to those of the instant case: Lake City's president paid B2B to transmit an advertisement on its behalf to thousands of recipients who had not been vetted by B2B and with whom it had no prior business relationship. *Id.* at 542-43. American Copper sued under the TCPA and moved for class certification, proposing a class consisting of all persons who were successfully sent a fax from Lake City Industrial Products, Inc. on one of three dates in February 2006. *Id.* To support the motion, American Copper attached a report from its expert

witness Robert Biggerstaff—Avio's expert in the instant case as well—concluding, based on his review of B2B's fax records, that a total of 10,627 successful transmissions of a complete fax were received by 10,627 unique fax numbers. *Id.* at 543. The district court certified the class and ultimately granted summary judgment to American Copper, rejecting Lake City's argument that it should not be held liable because B2B was the actual sender of the faxes. *Id.*

On appeal, Lake City attacked the class definition on the basis that it included plaintiffs who lacked standing to assert TCPA claims, specifically "persons that may not have ever received, noticed or printed the fax but who are somehow associated with a number on the hard drive's fax logs" and "persons that may not be (or who were) the owners of the machines or fax number [who] may or may not have actually received [the] fax." *Id.* at 544.

Lake City based its argument on a district court's decision in *Machesney v. Lar-Bev of Howell, Inc.*, 292 F.R.D. 412 (E.D. Mich. 2013)—another case based on faxes sent by B2B—which had held that only the "person or entity that owned the fax machine that received the unsolicited fax" had standing to sue under the TCPA. *American Copper,* 757 F.3d at 544. *American Copper* flatly rejected this argument and *Machesney*'s reasoning, finding instead that the TCPA's private right of action provision was not premised on ownership of the machine, *id.,* and explaining:

> The *Machesney* court's conclusion that the TCPA was "intended to address . . . the cost of the paper and ink incurred by the owner of the fax machine," 292 F.R.D. at 427, is too narrow. True, Congress was generally concerned with the costs associated with unsolicited fax advertisements. *See id.* at 426-27 (discussing the legislative history of the TCPA). But unsolicited fax advertisements impose costs on all recipients, irrespective of ownership and the cost of paper and ink, because such advertisements waste the recipients' time and impede the free flow of commerce. *Ira Holtzman, C.P.A. v. Turza,* 728 F.3d 682, 684 (7th Cir.2013) ("Even a recipient who gets the fax on a computer and deletes it without printing suffers *some* loss: the value of the time necessary to realize that the inbox has been cluttered by junk.") (emphasis in original); *Owners Ins. Co. v. European Auto Works, Inc.,* 695 F.3d 814, 820 (8th Cir.2012) (explaining that the TCPA was intended in part to "keep[ ] telephone lines from being tied up" by unsolicited fax advertisements); *Missouri ex rel. Nixon v. Am. Blast Fax, Inc.,* 323 F.3d 649, 655 (8th Cir.2003) (noting that "unsolicited fax advertising interferes with company switchboard operations and burdens the computer networks of those recipients who route incoming faxes into their electronic mail systems"). Accordingly, to the extent that Lake City relies on *Machesney* for the proposition

that owners (and only owners) of fax machines have standing to sue under the TCPA, we reject Lake City's argument.

*American Copper*, 757 F.3d at 544-45.

The *American Copper* panel also rejected Lake City's attack on the meaning of "successfully sent" in the class certification adopted by the district court. It found that a fax might be "successfully sent" without being received by its intended recipient: Biggerstaff's report showed that exactly 10,627 faxes were received by 10,627 different fax numbers. *Id.* at 545. Biggerstaff counted only "error-free transmissions" and the defendant failed to "offer[] any reason to think that [the defendant's] fax machines recorded the codes inaccurately or that its software maintained the log incorrectly." *Id.* (quoting *Ira Holtzman*, 728 F.3d at 685).

Alfoccino argues that *American Copper* is not dispositive on the standing issue here because it was presented in a different procedural posture and merely rejected defendant's argument concerning standing without touching on other issues pertinent to this case. But *American Copper* applied de novo review to the grant of summary judgment to the plaintiff, and its findings concerning who has standing to sue under the TCPA and what it means for a fax to be "successfully sent" are germane to the Article III standing question at the heart of this case.

Congress may not confer jurisdiction on Article III courts to issue advisory opinions, *Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972), and Congress cannot convert a generalized grievance "into an 'individual right' vindicable in the courts," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576-77 (1992). Congress may, however, "enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973). Thus, once "a statute confers new legal rights on a person, that person will have Article III standing to sue where the facts establish a concrete, particularized, and personal injury to that person as a result of the violation of the newly created legal rights." *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 781 F.3d 1245, 1251 (11th Cir. 2015).

The TCPA is just such a statute: it gives recipients of unsolicited fax advertising the legal right to recover damages and obtain injunctive relief from the senders of those faxes. 47 U.S.C. § 227(b)(1)(C), (b)(3). *American Copper* found that through the TCPA, Congress intended to

remedy a number of problems associated with junk faxes, including the cost of paper and ink, the difficulty of the recipient's telephone line being tied up, and the stress on switchboard systems. Thus, viewing or printing a fax advertisement is not necessary to suffer a violation of the statutorily-created right to have one's phone line and fax machine free of the transmission of unsolicited advertisements. Here, there is sufficient evidence in the record to conclude that the plaintiff suffered an injury on two occasions: a fax transmission on November 13, 2006, and another fax transmission on December 4, 2006.

The Sixth Circuit's holding in *American Copper* is not an outlier. Our sister circuits also hold that there is no need for a plaintiff to have printed the fax ad to have Article III standing. Reversing a district court decision to the contrary, in *Palm Beach Golf Center-Boca, Inc. v. Sarris*, the Eleventh Circuit concluded that "the specific injury targeted by the TCPA is the sending of the fax and resulting occupation of the recipient's telephone line and fax machine, not that the fax was actually printed or read," and that the plaintiff "has Article III standing sufficient to satisfy the injury requirement because it has suffered a concrete and personalized injury in the form of the occupation of its fax machine for the period of time required for the electronic transmission of the data (which, in this case was one minute)." 781 F.3d at 1250-51. Similarly the Seventh Circuit held that there is no need for a plaintiff to prove he printed the offending fax to recover under the TCPA, and that electronic confirmation of transmission suffices as proof absent evidence to the contrary. *Holtzman*, 728 F.3d at 684. And the Eighth Circuit, though not ruling on the precise issue, noted that the TCPA promotes an "interest in seclusion, as it also keeps telephone lines from being tied up . . ." *Owners Ins. Co.*, 695 F.3d at 820.

Here, the district court adopted the reasoning of the district court decision in *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 981 F. Supp. 2d 1239 (S.D. Fla. 2013), emphasizing that Plaintiff's injury is outside of "its own personal knowledge" because it did not remember nor did it produce the faxes. *Avio*, 18 F. Supp. 3d at 889. Subsequently, however, the Eleventh Circuit reversed its district court, as explained above. Under our precedent, therefore, and that of other circuits, Biggerstaff's report is adequate to establish that Avio was a recipient of Alfoccino's two unsolicited faxed advertisements and has standing.

The opinion below correctly notes that the TCPA bans unsolicited faxed advertisements, not all unsolicited faxes. But its conclusion that a "plaintiff must see the fax to discern whether it is an advertisement or not," *id.* at 890, is incorrect. Biggerstaff's report indicates that B2B faxed two particular advertisements to Avio and 7,624 other recipients. And Alfoccino concedes that it hired B2B to fax advertisements on its behalf and that it ultimately paid B2B for doing so. On these facts, a reasonable trier of fact could find by a preponderance of the evidence that the content of the two faxes at issue was advertising material prohibited by the TCPA.

Circuit precedent in *American Copper* and the text and legislative history of the TCPA itself point to the conclusion that Avio has Article III standing to bring its claim against the defendants.

**B. Direct Liability**

We now address the district court's second, independent basis for granting Alfoccino's motion for summary judgment: that the TCPA provides only for indirect—not direct—liability, and that Avio had failed to meet its burden of production with regard to Alfoccino's indirect liability. The pertinent FCC regulations, however, indicate that Alfoccino may be held *directly* liable for the faxes sent to Avio at issue here, and Avio has presented sufficient evidence to create a triable issue of fact on that point.

The TCPA makes it unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement"[3] unless the "sender" has an "established business relationship with the recipient" and meets several other requirements. 47 U.S.C. § 227(b)(1)(C). The FCC regulation defines "sender" with respect to the TCPA's prohibition of unsolicited fax advertisements as being "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10).

The FCC's codification of this definition of "sender" is in accord with its earlier uncodified interpretation: "the entity or entities on whose behalf facsimiles are transmitted are

---

[3]The statute defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5).

ultimately liable for compliance with the rule banning unsolicited facsimile advertisements, and that fax broadcasters are not liable for compliance with this rule." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 F.C.C. Rcd. 12391, 12407-08 (¶35) (1995).

The plain language of the TCPA and the FCC's accompanying definition of "sender" together establish that under the TCPA direct liability attaches to the entity whose goods are advertised as opposed to the fax broadcaster.[4]  Alfoccino is not entitled to summary judgment because Avio has presented evidence that Alfoccino was the entity "whose goods or services are advertised or promoted in the unsolicited advertisements" it received from B2B on two occasions in late 2006.  It could therefore be directly liable to Avio as the sender of the fax.

Rather than applying the FCC's codified definition of "sender" to the TCPA, the district court applied the FCC's decision in *DISH Network*, 28 F.C.C. Rcd. 6574 (2013).  The *DISH Network* decision, however, applies in a different context: the determination of direct and vicarious liability for *telemarketing voice calls*.  The TCPA makes it unlawful in certain circumstances to "initiate" a telephone call to a residential telephone line using an artificial or prerecorded voice.  47 U.S.C. § 227(b)(1)(B).  And an FCC regulation makes it unlawful in certain circumstances to "initiate" a telephone call to a residential subscriber whose number is registered on the national do-not-call registry.  47 C.F.R. § 64.1200(c)(2).

The FCC regulations governing these voice calls create distinctions that do not apply to fax transmissions. They identify who "initiates" these voice calls by distinguishing between the "telemarketer" and the "seller."  The "telemarketer" is defined as "the person or entity that initiates a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 C.F.R. § 64.1200(f)(11).  By contrast, the "seller" is defined as "the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or

---

[4]The fax broadcaster can be held liable under the TCPA in *some* cases.  In addition to providing for the liability for the "sender" of an unsolicited advertisement 47 C.F.R. § 64.1200(a)(4)(i), the regulations provide that the broadcaster "will be liable . . . if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions."  § 64.1200(a)(4)(vii).  This regulation provides additional confirmation that the FCC consistently distinguishes between the sender of a fax and the broadcaster of a fax.

investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(9). The *DISH Network* ruling applied these regulatory definitions of "seller" and "telemarketer" to hold that the party that is directly liable for unlawfully "initiat[ing]" such a call is the telemarketer that "takes the steps necessary to physically place a telephone call," not the seller whose goods or services the telemarketer promotes. *DISH Network*, 28 F.C.C. Rcd. at 6575 ¶ 3, 6583 ¶¶ 26-27. The *DISH Network* decision further found that the seller may be *vicariously* liable for such violations under federal common law agency principles. *Id.* at 6584-93 ¶¶ 28-47.

The *DISH Network* analysis is inapplicable to the fax transmissions at issue here. The words "seller" and "telemarketer" are not used in the sections of the TCPA and accompanying regulations that apply to unsolicited fax advertisements, and *DISH Network* did not address the FCC's definition of "sender" codified at 47 C.F.R. § 64.1200(f)(10). The FCC has subsequently made it clear that *DISH Network* pertains only to voice telephone calls, and that *DISH Network* had not altered the FCC's interpretation of the TCPA itself or the plain language of the FCC's accompanying regulations pertaining to unsolicited fax advertisements. The district court in *Palm Beach* had applied *DISH Network* to reach the same conclusion as the district court in the instant case. *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 781 F.3d at 1253-54. But when *Palm Beach* was appealed, the Eleventh Circuit contacted the FCC, referenced *DISH Network*, and asked the Commission to address its position "on whether the [TCPA] and its accompanying regulations allow a plaintiff to recover damages from a defendant who sent no facsimile to the plaintiff, but whose independent contractor did." FCC Letter Br., *Palm Beach Golf Center-Boca, Inc. v. Sarris*, No. 13-14013, 2014 WL 3962595 (11th Cir. July 17, 2014), at *1.[5]

In a letter brief, the FCC responded in the affirmative and explained that "[t]he *DISH Network* ruling did not address or alter the treatment of facsimile transmissions under the TCPA or the Commission's implementing regulations." *Id.* The FCC's letter brief first discussed the voice-call-related TCPA provisions and accompanying regulations at issue in the *DISH Network* decision as described above, *id.* at 2-3, then contrasted them with the statutory and regulatory provisions pertaining to fax advertisements. It explained that:

---

[5]The FCC letter brief cited here was filed as an attachment to the plaintiff-appellant's opening brief in the instant case. App. Dkt. 12 at A-08.

The TCPA uses different language governing facsimile transmissions. Specifically, the TCPA prohibits the "use [of] any telephone facsimile machine . . . to *send*, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C) (emphasis added). In contrast with the Commission's construction of "initiate" in the robo-call and do-not-call contexts—where FCC rules describe the directly-liable call "initiat[or]" as the "telemarketer" that physically makes the call—the FCC defines the directly-liable "sender," for purposes of the TCPA's unsolicited facsimile advertisement prohibition, as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10). In other words, under the plain text of that definition—and unlike the robo-call and do-not-call contexts—direct liability for sending an unsolicited facsimile advertisement attaches to the entity (defined as the "sender") whose goods or services are being promoted, and *not* generally to the entity that physically transmits the facsimile.

FCC Letter Br., *Palm Beach Golf Center-Boca*, 2014 WL 3962595, at *3 (underlined emphasis added). After further elaborating on the history of the FCC's regulations pertaining to fax transmissions and on the differences between those regulations and the definition of "seller" and "telemarketer" at issue in *DISH Network*, the FCC's letter brief concluded that:

the [*Palm Beach*] district court misapplied the TCPA, the *DISH Network* ruling, and FCC regulations regarding unsolicited facsimile advertisements to the extent that it ruled, as a matter of law, that the defendant . . . may not be directly liable under the TCPA for any unsolicited facsimile advertisement sent to the plaintiff . . . unless the defendant actually transmitted the fax.

*Id.* at *7. The instant case turns on a fact pattern effectively identical to *Palm Beach*, so the FCC decision in *DISH Network* is likewise inapplicable here.

Given that *DISH Network* does not have any bearing on the FCC's regulations pertaining to fax transmissions, liability turns on the plain language of the FCC's definition of "sender" in 47 C.F.R. § 64.1200(f)(10). Because this definition includes those "whose goods or services are advertised or promoted in the unsolicited advertisement," Alfoccino is a "sender" under the FCC's regulations implementing the TCPA. Direct liability may therefore attach to Alfoccino if an unsolicited advertisement for its goods or services was faxed to an entity with which it had no existing business relationship.

On appeal, Alfoccino notes that the TCPA's language concerning junk faxes makes it unlawful "to <u>use</u> any telephone facsimile machine . . . to send . . . an unsolicited advertisement . . . ." Appellees' Br. 30 (quoting 47 U.S.C. § 227(b)(1)(C) (emphasis added)). According to Alfoccino, because it did not itself "use" (in the sense of physically operate) a fax machine to send advertisements to Avio, it escapes direct liability under the TCPA. But the word "use" in the statute is directly tied to the word "send." Alfoccino's focus on the word "use" is therefore unconvincing in light of the FCC's regulation defining "sender," which has resolved the issue.

Neither the FCC's *Palm Beach* letter nor its regulations explain why the FCC has attached direct liability to the "telemarketer" that actually places a <u>voice</u> call while requiring proof of *vicarious* liability for the "seller" on whose behalf the call was made, yet has attached *direct* liability to the "sender" on whose behalf a <u>fax</u> advertisement was sent by a third party. Nonetheless, though Alfoccino questioned the reasoning of the FCC's letter brief and its application to this case, it has not directly challenged the legitimacy of the FCC's definition of sender in § 64.1200(f)(10). Nor is such a challenge likely to be viable because the Hobbs Act confers jurisdiction on Courts of Appeal to review FCC regulations only by direct appeal from the FCC. 28 U.S.C. § 2342(1); *Leyse v. Clear Channel Broadcasting, Inc.*, 545 F. App'x 444, 454-58 (6th Cir. 2013); *La Voz Radio de la Communidad v. FCC*, 223 F.3d 313, 320 (6th Cir. 2000); *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 448-49 (7th Cir. 2010).

The pertinent FCC regulations are explicit that the party whose goods or services are advertised—and not the fax broadcaster—is the sender. We therefore find that Alfoccino is a party subject to direct liability for the unsolicited Alfoccino advertisements B2B transmitted to Avio in violation of the TCPA.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to Alfoccino and REMAND the case to the district court for further proceedings in accordance with this opinion.