*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0203p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JAMES CHRISTOPHER BIDWELL; SUSAN
WILSON,

    *Plaintiffs-Appellants,*

  *v.*

UNIVERSITY MEDICAL CENTER, INC.;
LINCOLN RETIREMENT SERVICES COMPANY,
LLC,

    *Defendants-Appellees.*

No. 11-5493

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:10-cv-5—Thomas B. Russell, District Judge.

Argued: June 8, 2012

Decided and Filed:  June 29, 2012

Before:  MOORE, ROGERS, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John Frith Stewart, STEWART, ROELANDT, CRAIGMYLE & LYNCH, PLLC, Crestwood, Kentucky, for Appellants.  Mark Edward Elsener, PORTER, WRIGHT, MORRIS & ARTHUR, LLP, Cincinnati, Ohio, Jason P. Renzelmann, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellees.  **ON BRIEF:** John Frith Stewart, STEWART, ROELANDT, CRAIGMYLE & LYNCH, PLLC, Crestwood, Kentucky, for Appellants.  Mark Edward Elsener, PORTER, WRIGHT, MORRIS & ARTHUR, LLP, Cincinnati, Ohio, Jason P. Renzelmann, Gene F. Price, Griffin Terry Sumner, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellees.

————————————

**OPINION**

————————————

KAREN NELSON MOORE, Circuit Judge.    James Christopher Bidwell ("Bidwell") and Susan Wilson ("Wilson") appeal from a final order granting judgment on the administrative record to University Medical Center, Inc. ("UMC") and Lincoln Retirement Services Company LLC ("Lincoln").    Bidwell and Wilson assert claims against UMC and Lincoln for breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA") in connection with the transfer of Bidwell's and Wilson's investments from a stable value fund to a Qualified Default Investment Alternative ("QDIA") as newly defined by the Department of Labor ("DOL").  For the reasons that follow, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Background

Bidwell and Wilson were employees at UMC and participated in UMC's retirement contribution plans.  UMC administered the plan itself, although it sometimes solicited Lincoln's assistance for administrative tasks.  UMC provided plan participants with a variety of investment vehicles to choose from, and both Bidwell and Wilson elected to locate one hundred percent of their investment in the Lincoln Stable Value Fund.  At the time of their election, the Lincoln Stable Value Fund was also used by UMC as the default investment vehicle for § 403(b) plan participants who failed to elect a preferred investment vehicle after enrollment.

In 2007, the DOL promulgated new regulations pursuant to the Pension Protection Act ("PPA")[1] that aimed to insulate employers from liability for default investments made on behalf of retirement-plan participants who failed to elect their

——————————————

[1]The PPA, which was enacted in 2006, sought to increase employee participation in § 401(k) retirement plans by removing impediments to automatic-enrollment plans and limiting employer liability for investments made pursuant to automatic-enrollment plans.

preferred investment vehicle. In essence, the DOL regulation created "safe harbor relief from fiduciary liability" for plan administrators that directed automatic-enrollment investments into QDIAs, which were defined by the DOL as investments "capable of meeting a worker's long-term retirement savings needs." R. 32-1 (DOL Fact Sheet at 1-2). By creating incentives for employers to direct default investments into QDIAs, the DOL sought to incentivize employers to move investments away from "low-risk, low-return 'default' investments," such as stable-value funds, that may not always keep pace with inflation. *Id.* at 1. Thus, through the Safe Harbor, the DOL placed employers in the position of being able to make riskier short-term investments that would be more lucrative in the long term without the fear of liability for market fluctuations. To accommodate existing default-investment structures, the regulation also "grandfather[ed]" in stable-value funds that employers utilized as their default-investment mechanism prior to the PPA's enactment. *Id.* at 2 (internal quotation marks omitted).

In 2008, UMC sought to harmonize its investment practices with the new DOL regulation by making its default-investment vehicle the Lincoln *LifeSpan* Fund and transferring existing investments in the prior default fund, the Lincoln Stable Value Fund, into the Lincoln *LifeSpan* Fund. Because UMC did not have records of which participants elected to invest in the Lincoln Stable Value Fund and which participants were investors by default, UMC sent notice of the change to all participants with one-hundred percent of their investment in the Lincoln Stable Value Fund. The notice advised the participants that all existing investments in the Lincoln Stable Value Fund would be transferred to the Lincoln *LifeSpan* Fund unless the participants gave instruction otherwise by July 16, 2008.

UMC solicited the assistance of Lincoln in distributing the notices. UMC sent Lincoln a list of 2,532 recipients, which included Bidwell and Wilson with their correct addresses, and instructed Lincoln to mail each recipient a copy of the notice letter. Lincoln's records indicate that it mailed all 2,532 letters by first-class postage, although there is no record of whether the letters were actually received by the intended

recipients. Bidwell and Wilson maintain that they never received the notice. As a result they did not respond by the deadline specified in the letter, and UMC transferred their investment from the Lincoln Stable Value Fund to the Lincoln *LifeSpan* Fund without their knowledge. Bidwell and Wilson first learned of the transfer upon receipt of their quarterly account statements, immediately contacted UMC on October 15, 2008 to inquire about the change, and then switched their investments back to the Lincoln Stable Value Fund. Due to market fluctuations in the interim, however, both Bidwell and Wilson suffered financial losses prior to the return of their funds to the Lincoln Stable Value Fund.

## B. Procedural History

In February 2009, both Bidwell and Wilson filed claims with UMC seeking reimbursement for their losses, in the amounts of $85,000 and $16,900 respectively, resulting from the transfer of their investments from the Lincoln Stable Value Fund to the Lincoln *LifeSpan* Fund, but their claims were denied. Both appealed unsuccessfully to the Administrative Committee.

Having exhausted the administrative procedures, Bidwell and Wilson filed suit in federal district court against UMC and Lincoln for breach of fiduciary duty under ERISA. After filing answers, both Lincoln and UMC moved for judgment as a matter of law on the administrative record. The district court granted both motions, concluding that Lincoln could not be liable to Bidwell and Wilson because it was not a fiduciary under the plan and that UMC was immune from liability because it was entitled to the Safe Harbor protections of the DOL regulation. Bidwell and Wilson timely appeal.

## II. ANALYSIS

On appeal, Bidwell and Wilson focus their arguments exclusively on the district court's grant of judgment in favor of UMC, arguing that the district court erred in concluding that UMC was shielded by the DOL Safe Harbor regulation. Lincoln nevertheless has filed a brief on appeal in its defense. Accordingly, we address the claims against each party in turn.

**A. Standard of Review**

"This Court reviews a district court's judgment in an ERISA case *de novo*, applying the same standard of review to the administrator's action as required by the district court." *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 427 (6th Cir. 2006). "Claims for breaches of fiduciary duty . . . are not claims for denial of benefits and are therefore addressed in the first instance in the district court, requiring no deference to any administrator's action or decision." *Id.*

**B. Lincoln**

"The threshold question in all cases charging breach of ERISA fiduciary duty is whether the defendant was 'acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.'" *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 552 (6th Cir. 2012) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)). "For purposes of ERISA, a fiduciary not only includes persons specifically named as fiduciaries by the benefit plan, but also anyone else who exercises discretionary control or authority over a plan's management, administration, or assets." *Id.* (internal quotation marks and alterations omitted). The district court dismissed the claims against Lincoln on this threshold fiduciary issue. Lincoln correctly argues that Bidwell and Wilson have waived appeal of this decision because they have failed to raise arguments in opposition on appeal. *See Harris v. Bornhorst*, 513 F.3d 503, 518 (6th Cir. 2008) (arguments before the district court not raised on appeal are deemed waived). Accordingly, we AFFIRM the district court's dismissal of Bidwell's and Wilson's claims against Lincoln.

**C. UMC**

The parties do not dispute that UMC is the plan administrator and, consequently, a fiduciary. However, the district court concluded that Bidwell and Wilson could not proceed with their claims against UMC because UMC is entitled to the Safe Harbor relief provided in the DOL's regulation. On appeal, Bidwell and Wilson contend that the district court's conclusion was erroneous because the Safe Harbor provision can

never insulate a fiduciary against claims by plan participants, like Bidwell and Wilson, who previously elected their investment vehicle rather than having it chosen for them by default. Bidwell and Wilson also argue that UMC's act of transferring the investment from the Lincoln Stable Value Fund to the QDIA is outside the scope of the DOL regulation and violates the terms of the UMC plan, entitling them to relief. For the reasons that follow, the district court properly held that the DOL Safe Harbor prevents Bidwell and Wilson from obtaining the relief requested.

Section (b) of the DOL regulation sets out a Safe Harbor for plan administrators as follows:

> (1) Except as provided in paragraphs (b)(2), (3), and (4) of this section, a fiduciary of an individual account plan that permits participants or beneficiaries to direct the investment of assets in their accounts and that meets the conditions of paragraph (c) of this section shall not be liable for any loss, or by reason of any breach under part 4 of title I of ERISA, that is the direct and necessary result of (i) investing all or part of a participant's or beneficiary's account in any qualified default investment alternative within the meaning of paragraph (e) of this section, or (ii) investment decisions made by the entity described in paragraph (e)(3) of this section in connection with the management of a qualified default investment alternative.

29 C.F.R. § 2550.404c-5(b)(1) (2012). Section (c) of the regulation then sets out six different conditions that must be satisfied in order for the Safe Harbor provision to apply. 29 C.F.R. § 2550.404c-5(c). The DOL has summarized these requirements as follows:

> (1) "Assets must be invested in a 'qualified default investment alternative' (QDIA) as defined in the regulation."
> (2) "Participants and beneficiaries must have been given an opportunity to provide investment direction, but have not done so."
> (3) "A notice generally must be furnished to participants and beneficiaries in advance of the first investment in the QDIA and annually thereafter. The rule describes the information that must be included in the notice."
> (4) "Material, such as investment propectuses, provided to the plan for the QDIA must be furnished to participants and beneficiaries."
> (5) "Participants and beneficiaries must have the opportunity to direct investments out of a QDIA as frequently as from other plan investments, but at least quarterly. The rule limits the fees that can

be imposed on a participant who opts out of participation in the plan or who decides to direct their investments."

(6) "The plan must offer a 'broad range of investment alternatives' as defined in the Department's regulation under section 404(c) of ERISA."

R. 32-1 (DOL Fact Sheet at 1).

Rather than challenging UMC's failure to satisfy one of these conditions, Bidwell and Wilson argue that UMC's reliance on the Safe Harbor provision is a red herring. They argue that the Safe Harbor provision applies only to employer-selected investments made on behalf of participants who fail to elect an investment vehicle, and that neither Bidwell nor Wilson qualifies as such a participant because each specifically selected the Lincoln Stable Value Fund. In keeping with this argument, Bidwell and Wilson also assert that UMC had a duty to maintain records of which investors in the Lincoln Stable Value Fund were investors by election and which were investors by default in order to afford special treatment to the investors by election. Essentially, they argue that as original investors by election they had a right to have their investment remain within the Lincoln Stable Value Fund until they explicitly directed UMC otherwise.

In enacting the Safe Harbor provision, the DOL made clear that it did not agree with Bidwell's and Wilson's interpretation of the regulation. In the preamble to the final regulation, the DOL stated explicitly that "the final regulation applies to situations beyond automatic enrollment" including circumstances such as "[t]he failure of a participant or beneficiary to provide investment direction following the elimination of an investment alternative or a change in service provider, the failure of a participant or beneficiary to provide investment instruction following a rollover from another plan, and any other failure of a participant or beneficiary to provide investment instruction." 72 Fed. Reg. 60452-01, 60453 (Oct. 24, 2007). Thus, the DOL emphasized that "[w]henever a participant or beneficiary has the *opportunity to direct the investment* of assets in his or account, *but does not direct the investment* of such assets, plan fiduciaries may avail themselves of the relief provided by this final regulation, so long as" the other Safe Harbor requirements are satisfied. *Id.* (emphasis added). The DOL was clear also that the "opportunity to direct investment" includes the scenario where a plan

administrator requests participants who previously had elected a particular investment vehicle to confirm whether they wish for their funds to remain in that investment vehicle. The DOL explained:

> It is the view of the Department that any participant or beneficiary, following receipt of a notice in accordance with the requirements of this regulation, may be treated as failing to give investment direction for purposes of paragraph (c)(2) of § 2550.404c-5, without regard to whether the participant or beneficiary was defaulted into or elected to invest in the original default investment vehicle of the plan. Under such circumstances, and assuming all other conditions of the regulation are satisfied, fiduciaries would obtain relief with respect to investments on behalf of those participants and beneficiaries in existing or new default investments that constitute qualified default investment alternatives.

*Id.* at 60464. In essence the DOL explained that, upon proper notice, participants who previously elected an investment vehicle can become non-electing plan participants by failing to respond. As a result, the plan administrator can direct those participants' investments in accordance with the plan's default investment policies and with the benefit of the Safe Harbor protections.

"We generally give substantial deference to an agency's interpretations of its own regulations" unless the "interpretation is plainly erroneous or inconsistent with the published regulations." *Crestview Parke Care Ctr. v. Thompson*, 373 F.3d 743, 750 (6th Cir. 2004) (internal quotation marks and alterations omitted). There is no basis to disregard the DOL's interpretation of its Safe Harbor regulation because, despite Bidwell's and Wilson's arguments to the contrary, there is no error or inconsistency in the DOL's interpretation. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 1004 (9th Cir. 2010) (stating that deference is due to DOL's interpretation of its own regulation); *see also Caremark, Inc. v. Goetz*, 480 F.3d 779, 790 (6th Cir. 2007) (according deference to DOL interpretation of ERISA statute in advisory opinion); *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1072 (6th Cir. 1994) ("[W]e are obliged to accord great deference to DOL interpretations."). Although Bidwell and Wilson argue that the DOL's interpretation conflicts with UMC's obligation to keep records of which participants are investors by election and which participants are investors by default,

Bidwell and Wilson cite no authority stating that such a record-keeping obligation exists. Moreover, while perhaps this argument would have more traction if UMC had acted unilaterally without providing notice, that is not the circumstance presented here. UMC notified all participant investors to substitute for its lack of knowledge and to ensure that all would have an opportunity to clarify their investment preferences. In sum, Bidwell's and Wilson's unsupported assertions are insufficient to defeat the DOL's reasonable interpretation of its own regulation.

Bidwell and Wilson also argue that the transfer of funds from the Lincoln Stable Value Fund to the Lincoln *LifeSpan* Fund is not governed by the Safe Harbor and was an independent breach of the UMC § 403(b) plan. This argument also fails. First, it is clear by the plain language of the DOL regulation that the Safe Harbor extends to acts of a fiduciary in which it transfers funds from one investment vehicle to a QDIA. *See* 29 C.F.R. § 2550.404c-5(b)(i) ("[A] fiduciary . . . shall not be liable for any loss . . . that is the direct and necessary result of (1) investing all or part of a participant's or beneficiary's account in any qualified default investment alternative"). Indeed, the DOL set out such scenarios as specific examples to illustrate the application of the Safe Harbor. *See* 72 Fed. Reg. at 60454. Second, as the district court reasoned, UMC's act of transferring the funds not otherwise directed by the participants from the Lincoln Stable Value Fund into the QDIA was within the scope of UMC's authority. Although it is true that the § 403(b) plan states that "[a]ll elections shall control until a new election is made," R. 19 (Sealed Admin. Record, 403(b) Plan, § 9.11(a), APX at 121-22), this provision must be read in conjunction with other plan provisions that provide the plan administrator with "all powers necessary to enable" the proper administration of the fund, *id.* at APX 117 (403(b) Plan, § 8.2), including the power to direct a participant's investment where no election is made, *id.* at APX 122 (403(b) Plan, § 9.11(a)), to restrict investments as necessary, *id.* (403(b) Plan, § 9.11(b)), and to establish uniform rules for the administration of the plan, *id.* (403(b) Plan, § 9.11(d)). It is reasonable to conclude that these powers include the capacity to require plan participants either to confirm their investment election or to have their investment transferred to a new investment mechanism in the interest of aligning the administration

of the fund with new federal regulations. Accordingly, UMC's transfer did not violate the terms of the plan.**2**

One additional issue, which Bidwell and Wilson do not address, is whether UMC complied with the notice requirement for the Safe Harbor provision to apply. Although it is troubling that Bidwell and Wilson did not receive notice of the change, UMC's actions in distributing the notice were not deficient under ERISA. Under ERISA, a fiduciary is obligated to take measures "reasonably calculated to ensure actual receipt of the material by plan participants." 29 C.F.R. § 2520.104b-1(b)(1). Here, UMC provided the correct addresses to Lincoln for distribution of the notice by first-class mail, and there are records indicating that Lincoln sent out the correct number of letters as directed. Although more proof could be had, perhaps through individual delivery confirmation, UMC's actions were "reasonably calculated to ensure actual receipt" and it was reasonable for UMC to rely on the dependability of the first-class-mail system and Lincoln's proof that the correct number of letters were sent out. *See id.* ("Material distributed through the mail may be sent by first, second or third-class mail."). Indeed, Bidwell and Wilson do not appear to allege that UMC took inadequate actions in issuing the notice; they focus only on the fact that they did not receive the notice. Because the focus of our inquiry is on UMC's action, their arguments are insufficient to substantiate their claim. *See Custer v. Murphy Oil USA, Inc.*, 503 F.3d 415, 419 (5th Cir. 2007) (acknowledging that it is not the actual receipt of notice that is relevant, but the acts of the fiduciary in attempting to ensure that notice is delivered).

Bidwell and Wilson do not raise any other arguments in opposition to the Safe Harbor's application. Indeed, at one point in their reply brief, they appear to concede that all requirements for the Safe Harbor are satisfied by stating that "UMC may have followed QDIA procedures for default investments." Reply Br. at 5 (alterations omitted).

---

**2**To the extent that Bidwell and Wilson argue that statements in the Plan Summary trump the terms of the Plan itself, UMC is correct that the language Bidwell and Wilson quote as being from the Plan Summary is included in the § 403(b) plan itself. *See* Appellants' Br. at 9; R. 19 (Sealed Admin. Record, 403(b) Plan, § 9.11(a), APX at 121-22 ). Accordingly, there does not appear to be any actual conflict between the two documents, and we need not consider the applicability of the Supreme Court's recent decision in *Cigna Corp. v. Amara*, --- U.S. ---, 131 S. Ct. 1866 (2011).

Accordingly, any challenges on this basis are also waived.  *See Harris*, 513 F.3d at 518 (arguments before the district court not raised on appeal are deemed waived). Consequently, we AFFIRM the district court's entry of judgment in favor of UMC.

### III.  CONCLUSION

Based on the foregoing, we **AFFIRM** the judgment of the district court in favor of Lincoln and UMC.