RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0110p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SIDING AND INSULATION CO.,

               *Plaintiff-Appellant,*

   *v.*

ALCO VENDING, INC.,

               *Defendant-Appellee*.

No. 15-3551

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:11-cv-01060—Lesley Brooks Wells, District Judge.

Argued: March 8, 2016

Decided and Filed: May 9, 2016

Before: CLAY, GILMAN, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Phillip A. Bock, BOCK & HATCH, LLC, Chicago, Illinois, for Appellant. Albert M. Bower, SMITH AMUNDSEN, Chicago, Illinois, for Appellee. **ON BRIEF:** Phillip A. Bock, BOCK & HATCH, LLC, Chicago, Illinois, David M. Oppenheim ANDERSON + WANCA, Rolling Meadows, Illinois, for Appellant. Albert M. Bower, Eric L. Samore, Michael Resis, SMITH AMUNDSEN, Chicago, Illinois, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. The Siding and Insulation Co. (Siding) is a closely held corporation that provides construction contracting services in northern Ohio. In November 2005, Siding received an unsolicited fax advertisement that promoted the services of

another company, Alco Vending, Inc. (Alco).  Siding had not previously consented to receive such advertisements.  It subsequently sued Alco on the ground that sending the fax advertisement violated the Telephone Consumer Protection Act of 1991 (the TCPA).

Alco responded by pointing out that it was not the sender of the offending advertisement.  Instead, an individual named Caroline Abraham, doing business as Business to Business Solutions (B2B), had transmitted the advertisement using B2B's own equipment.  Alco acknowledged that it had paid B2B to provide advertising services by broadcasting faxes to consenting businesses, but not to nonconsenting ones like Siding.  It therefore contended that Alco should not be held liable for any violation of the TCPA that might have occurred.

The district court granted summary judgment in Alco's favor.  But because the court applied the wrong legal standard in doing so, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.    Factual background

Siding's primary business consists of installing insulation, roofing, siding, windows, and doors.  Alco is a company that installs and stocks vending machines for its customers.  At the time of the events giving rise to this litigation, Alco's president and secretary was Richard Gajdos.

In the early- and mid-2000s, Alco received several advertisements from B2B.  These advertisements proclaimed that B2B was a "fax broadcaster" that could provide advertising services for Alco by sending faxes to potential Alco customers.  Sometime in October 2005, Gajdos decided to accept B2B's offer to provide such services.

This decision led to a series of communications between B2B, Alco, and a third company—a Romanian business identified as Macaw, S.R.L.—that worked with B2B.  First, a Macaw salesperson working under the pseudonym Kevin Wilson sent Gajdos a form seeking information about the nature of Alco's business.  Gajdos completed the form by providing Alco's contact information and three "selling points" that could be included in any

advertisements that B2B subsequently prepared. Next, B2B drafted sample advertisements and sent them to Gajdos for his review. Each sample advertisement included a legend stating that the message was "the exclusive property of Macaw . . . , which is solely responsible for its contents and destinations."

Gajdos also had six to ten conversations with Wilson, during which the pair discussed topics such as the content of the potential advertisements, the intended recipients for those advertisements, and the way in which Alco would pay for B2B's services. According to Gajdos, Wilson explained that B2B would identify advertisement recipients by reference to a list of businesses that had previously consented to receive fax advertising from B2B. Gajdos never saw or reviewed this list, but he understood (1) that each business would be located near Alco's place of operations in northern Ohio, and (2) that B2B had a preexisting relationship with each business. Wilson also assured Gajdos that any advertising that B2B did for Alco would be "100 percent legal" because "[B2B] had a full and open relationship" with the potential fax recipients.

After these conversations, Alco arranged to pay for B2B's services by (1) sending B2B a photocopy of a check, and (2) authorizing B2B to use the information from the check to withdraw funds directly from Alco's checking account. B2B then broadcast several thousand faxes, each of which advertised Alco's business. The faxes were broadcast on November 2, 2005 and again on July 10, 2006, with B2B withdrawing $188 from Alco's checking account to pay for each day of broadcasting. Siding's expert witness later concluded that approximately 7,000 faxes were sent to a host of local businesses and other entities.

According to Gajdos, B2B did not inform Alco about the number of faxes that B2B broadcast, the dates on which the faxes were sent, or the specific businesses to which the faxes were addressed. Gajdos also testified that Alco itself had no involvement in selecting the specific businesses to which B2B transmitted the faxes.

After each fax broadcast, Alco received a few scattered letters from attorneys who stated that their clients had received unauthorized faxes that advertised Alco's services. The letters threatened legal action against Alco on the ground that the transmission of the faxes violated the

TCPA. In particular, the letters asserted that Alco had violated 47 U.S.C. § 227(b)(1)(C) by sending the fax advertisements without first obtaining authorization from the fax recipients.

Alco did not handle these complaints itself; it instead referred the complaints to B2B. In turn, B2B contacted the complaining businesses and explained that, despite the claims that the faxes were unauthorized, someone associated with each recipient business must have previously agreed to receive the faxes. In addition, B2B provided two letters to Alco in which B2B maintained that the faxes that it had broadcast were lawful and duly authorized. One letter stated that B2B—rather than Alco—was "solely responsible for the contents and destinations of [the] faxes." The other letter provided that B2B would reimburse Alco for the costs of any legal action or judgment against Alco arising as a result of the fax advertising campaign.

## B.     Procedural background

Such legal action materialized when Siding filed suit against Alco in May 2011 in the United States District Court for the Northern District of Ohio. Siding alleged in relevant part that Alco had violated the TCPA, 47 U.S.C. § 227(b)(1)(C), by sending unsolicited fax advertisements to Siding and others. The complaint purported to bring claims on behalf of Siding and a class of at least 39 other recipients of the faxes. Siding then moved for certification of a class consisting of "[a]ll persons who were successfully sent one or more faxes on November 2, 2005 or July 10, 2006, from Alco Vending."

While Siding's motion for class certification was still pending, Alco moved for summary judgment. It first observed that B2B—not Alco—was the entity that had broadcast the faxes that allegedly violated the TCPA. Alco then contended that it was not liable for B2B's conduct under either (1) a theory of strict liability, or (2) a theory of vicarious liability. Specifically, Alco maintained that it had authorized B2B to broadcast faxes only to businesses that had previously consented to receive such faxes. Alco thus argued that B2B had exceeded the scope of its authority in a way that precluded any finding that Alco was liable for B2B's conduct.

Siding responded that the Federal Communications Commission's (FCC's) governing regulations established that Alco was either (1) strictly liable for the transmission of the faxes, or (2) liable because the faxes were sent "on behalf of" Alco. With respect to the former argument,

Siding observed that the TCPA currently imposes liability on those entities whose "goods or services are advertised or promoted in [an] unsolicited advertisement." *See* 47 C.F.R. § 64.1200(f)(10). Siding then noted that Alco does not dispute that the latter's services were in fact advertised in the relevant faxes, with the result that Alco should be held liable for any TCPA violations associated with those faxes.

Regarding its alternative argument, Siding noted that the TCPA also imposes liability on an entity when an unsolicited advertisement is sent "on behalf of" that entity. *See id.* (imposing liability on "the person or entity on whose behalf a facsimile unsolicited advertisement is sent"). Siding then asserted that B2B had in fact sent the faxes at issue on behalf of Alco, thereby rendering Alco liable for the alleged TCPA violations.

In January 2014, the district court referred Siding's motion for class certification and Alco's motion for summary judgment to a magistrate judge for preparation of a report and recommendation. The magistrate judge subsequently recommended that (1) Alco's motion for summary judgment be granted, and (2) Siding's motion for class certification be denied as moot. In doing so, the magistrate judge agreed with Alco that it could be held liable for TCPA violations only on the basis of vicarious liability under the federal common law of agency. The magistrate judge then concluded that the evidentiary record established that Alco had not authorized or ratified B2B's conduct, thereby absolving Alco of any vicarious liability for B2B's broadcast of the faxes.

Siding objected to the report and recommendation, but the district court overruled those objections in April 2015. The court thereafter entered summary judgment in Alco's favor. Siding has timely appealed

## II. ANALYSIS

### A.    Standard of review

The parties dispute which legal standard should govern Siding's TCPA claim against Alco. Their dispute over statutory and regulatory interpretation raises a question of law, which

we review de novo. *RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 384 (6th Cir. 2014).

The parties further dispute whether, under the applicable legal standard, summary judgment in favor of Alco was warranted. A district court's grant of summary judgment is also reviewed de novo. *Cass v. City of Dayton*, 770 F.3d 368, 373 (6th Cir. 2014). Summary judgment is appropriate when there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We view all the evidence and draw all reasonable inferences in favor of the nonmoving party. *Cass*, 770 F.3d at 373.

**B.      Applying the proper legal standard for liability under the TCPA**

The parties present three different legal standards by which Alco's conduct could be judged. First, Siding asserts that the regulations that the FCC has promulgated to implement the TCPA impose strict liability on any person whose goods or services are advertised in an offending fax. Alco responds that this standard is not applicable to the time period when the faxes in question were broadcast. It instead maintains that the only way that it can be held liable is under a theory of vicarious liability derived from federal common-law principles of agency. Finally, both parties acknowledge the existence of a third standard, under which the FCC has concluded that an entity is liable for violating the TCPA if an offending fax was sent "on behalf of" the entity.

In analyzing these three standards, we will refer to them as the "strict-liability" standard, the "vicarious-liability" standard, and the "on-whose-behalf" standard. We ultimately conclude that the "on-whose-behalf" standard is the proper choice for evaluating Alco's conduct.

### *1.  The strict-liability standard*

The TCPA and the FCC's regulations implementing the Act provide that a person may not "use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C); *see also* 47 C.F.R. § 64.1200(a)(4) (the FCC's regulation stating a similar prohibition). In 2006, the FCC

promulgated in the Code of Federal Regulations a definition describing who can be held liable as the "sender" of a fax advertisement (the 2006 codification). The codified definition provides that "[t]he term sender . . . means the person or entity [1] on whose behalf a facsimile unsolicited advertisement is sent or [2] whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10).

Siding in the present case seeks to apply the latter portion of this definition of "sender," i.e., "the person or entity . . . whose goods or services are advertised or promoted in the unsolicited advertisement." It notes that there exists no dispute that Alco's services were indeed advertised in the faxes that B2B broadcast, with the result that applying the strict-liability standard in this case would definitively render Alco's conduct a violation of the TCPA.

Alco responds that this second definition of "sender" does not apply to the present case. It observes that the faxes at issue were broadcast by B2B in November 2005 and July 2006, but that the new definition of "sender" in 47 C.F.R. § 64.1200(f)(10) did not become effective until August 1, 2006. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005*, 21 FCC Rcd. 3787, 3815-16 (2006) [hereinafter *Junk Fax Regulations*] (setting the effective date for the regulation in question). Alco thus contends that enforcing the definition of "sender" in 47 C.F.R. § 64.1200(f)(10) would constitute an impermissible retroactive application of the regulation.

This argument raises an "apparent tension" between two conflicting rules. *See BellSouth Telecomm., Inc. v. Se. Tel., Inc.*, 462 F.3d 650, 657 (6th Cir. 2006) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 263-64 (1994)). On the one hand, "a court must apply the law in effect at the time it renders its decision." *Id.* (internal quotation marks omitted). But on the other hand, "courts should not construe congressional enactments and administrative rules to have retroactive effect unless their language requires this result." *Id.* (alteration and internal quotation marks omitted). Courts accordingly "apply the law in effect at the time that they decide a case *unless* that law would have an impermissible retroactive effect as that concept is defined by the Supreme Court." *Id.* (emphasis in original).

Whether a retroactive application is impermissible turns on the new enactment's consequences. *Id.* at 658. If the retroactive application "attaches new legal consequences," such as "impairing rights a party possessed when he acted, increasing a party's liability for past conduct, or imposing new duties with respect to transactions already completed," then a court should refrain from a retroactive application. *Id.* (alterations, citations, and internal quotation marks omitted). Courts making such evaluations should "take sound guidance from familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* (internal quotation marks omitted).

In the present case, a retroactive application of the definition of "sender" in § 64.1200(f)(10) would clearly "increase[] a party's liability for past conduct." This is because Alco's services were indisputably the ones advertised in the faxes. Hence, if the new definition of "sender" applies, Alco would be strictly liable for the transmission of the unauthorized faxes. If, on the other hand, the new definition does not apply, then Alco retains at least some chance to escape liability. *See* Part II.C. below. Application of the definition of "sender" in this case would therefore be impermissibly retroactive, *see BellSouth*, 462 F.3d at 657-58, meaning that the new definition should not be applied to Alco's conduct, *see id.*

Considerations of "fair notice, reasonable reliance, and settled expectations," *see id.* at 658, also support this conclusion. In promulgating the regulations that include the new definition of "sender," the FCC recognized that "facsimile senders may need additional time beyond 30 days to comply with the rules adopted herein." *Junk Fax Regulations*, 21 FCC Rcd. at 3815-16. The FCC added that "it is important to provide adequate time for senders to come into compliance with the rules adopted in this order." *Id.* at 3816. Based on these statements, the FCC itself acknowledged that applying the new rules carried the risk that potential fax senders would be deprived of fair notice of the rules' effects and would have their settled expectations about the extent of their potential liability abruptly changed. These considerations support the conclusion that the new definition of "sender" should not be applied to Alco in the present case.

Siding seeks to avoid this result by arguing that the 2006 codification did not actually change the standard of liability to be applied under the TCPA. It maintains that the FCC has always interpreted the term "sender" in a manner consistent with the 2006 codification, with the

result that an entity whose goods or services are advertised in an offending fax has always been held liable as the "sender" of the fax.  Such a result would mean that the 2006 codification did not actually change the parties' duties or liabilities for past conduct.  And that, in turn, would mean that the 2006 definition of "sender" could permissibly be applied to the faxes in this case. *See BellSouth*, 462 F.3d at 657-58.

As support for its argument, Siding cites a 1995 FCC order for the proposition that the 2006 definition of "sender" simply "reflected the FCC's longstanding view as expressed in its prior orders."  The cited portion of the 1995 order reads as follows:

> 34. Unsolicited Facsimile Advertisements.  Some petitioners request clarification of whether responsibility for compliance with the ban on unsolicited facsimile advertising and with the facsimile identification requirement lies with the entity or entities on whose behalf such messages are sent or with service providers ("fax broadcasters").  Generally these commenters are fax broadcasters who disseminate facsimile messages for their clients.  They favor excluding any fax broadcaster, whether or not a common carrier, from responsibility for compliance with the rules, and assigning ultimate responsibility to the author or originator of the facsimile message. . . .
>
> 35. Decision.  We clarify that the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements, and that fax broadcasters are not liable for compliance with this rule.  This interpretation is consistent with the TCPA's legislative history, and with our finding in the Report and Order that carriers will not be held liable for the transmission of a prohibited message.

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12407-08 (1995) [hereinafter, *1995 Order*] (footnotes omitted).

As indicated by its own text, the *1995 Order* includes no language referring to "the person or entity . . . whose goods or services are advertised or promoted in the unsolicited advertisement."  47 C.F.R. § 64.1200(f)(10).  Rather, the order defines the potentially liable entities only as those "on whose behalf facsimiles are transmitted."  10 FCC Rcd. at 12407.  The *1995 Order* therefore does not support Siding's assertion that the 2006 definition of "sender" simply codified the preexisting definition of "sender" that had purportedly been established by the FCC's earlier regulations.

This was made clear in 2006 by the FCC itself when it proposed the new definition of "sender." At that time, the FCC recognized that, in accordance with the *1995 Order*, it had previously stated that "the sender is the person or entity on whose behalf the advertisement is sent." *Junk Fax Regulations*, 21 FCC Rcd. 3787, 3808 (2006). It then stated that "*[i]n most instances*, this will be the entity whose product or service is advertised or promoted in the message." *Id.* (emphasis added).

The italicized language indicates that there exist situations in which (1) the "entity on whose behalf the advertisement is sent" and (2) the "entity whose product or service is advertised" are *not* one and the same. These terms, in other words, are not synonymous. Hence, by including the phrase "person or entity . . . whose goods or services are advertised or promoted" in the text of § 64.1200(f)(10), the FCC in 2006 expanded the scope of liability under the TCPA. No longer would liability extend only to those entities "on whose behalf the advertisement [was] sent," *1995 Order*, 10 FCC Rcd. at 12407; instead, liability after the promulgation of the 2006 definition would extend to both those entities "on whose behalf the advertisement [was] sent" *and* those entities "whose goods or services [were] advertised or promoted in the unsolicited advertisement," *see* 47 C.F.R. § 64.1200(f)(10).

Because of this expansion of liability, the 2006 definition of "sender" did in fact change the law of TCPA liability. Siding's argument to the contrary is therefore without merit. Moreover, such an expansion of liability is exactly the sort of change in the law that ought not be applied retroactively. *See BellSouth*, 462 F.3d at 657-58 (noting that a retroactive application is inappropriate when the application has the effect of "increasing a party's liability for past conduct" (alteration omitted)). The 2006 definition of "sender" accordingly should not be applied to conduct (such as Alco's) that occurred before the effective date of that definition.

Siding next tries to escape this conclusion by arguing that the FCC itself has asserted that its understanding of the term "sender" has never changed. In the Eleventh Circuit case of *Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015), the court requested the views of the FCC regarding liability under the TCPA. *Id.* at 1254. The FCC responded with a letter brief stating in part that the definition of "sender" promulgated in 2006 "is consistent with the Commission's pre-existing uncodified interpretation that 'the entity

or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements.'" FCC Letter Brief at 4, 2014 WL 3962595 at *4, as filed in *Palm Beach Golf Center*. Siding reads this language as proof that the 1995 and the 2006 definitions of "sender" were and are the same. It then adds that, as a matter of administrative law, we should defer to the FCC's position as articulated in the letter brief.

Siding's first proposition is questionable. Although the FCC did say that the 1995 and the 2006 definitions are "consistent," that is hardly the same as stating that the definitions are synonymous. The statement about consistency, for example, could have been a reference to the fact that both the *1995 Order* and the 2006 definition include the "on whose behalf" language, without expressing an opinion on the 2006 definition's new language imposing liability on entities whose goods or services are advertised in a fax. But even assuming *arguendo* that the FCC did indeed mean to assert that the 1995 and the 2006 definitions of "sender" are identical, this court, as explained below, need not defer to the FCC's assertion.

Whether and to what degree a court must defer to the opinion of an administrative agency varies with the nature of the opinion and the process by which the opinion was formulated. *See generally United States v. Mead Corp.*, 533 U.S. 218 (2001). Where, as in this case, the relevant opinion results from an agency's interpretation of its own regulations, that opinion is typically entitled to significant deference. *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000) ("[C]ourts are to give substantial deference to an agency's interpretation of its own regulations." (internal quotation marks omitted)). This deference, however, is warranted only if the agency's interpretation is both reasonable and consistent with the plain language of the regulation at issue. *Bidwell v. Univ. Med. Ctr., Inc.*, 685 F.3d 613, 619 (6th Cir. 2012) ("We generally give substantial deference to an agency's interpretations of its own regulations unless the interpretation is plainly erroneous or inconsistent with the published regulations." (internal quotation marks omitted)); *AJP Const., Inc. v. Sec'y of Labor*, 357 F.3d 70, 75 (D.C. Cir. 2004) ("[W]e defer to agencies' reasonable interpretations of their own regulations . . . .").

The FCC's letter brief in *Palm Beach Golf Center* is not consistent with its own regulations. As noted above, the FCC in 1995 defined the "sender" of a fax as "the entity or entities on whose behalf facsimiles are transmitted." *1995 Order*, 10 FCC Rcd. 12391, 12407.

In contrast, the 2006 codification defines the "sender" of a fax as *both* (1) "the person or entity on whose behalf a facsimile unsolicited advertisement is sent," *and* (2) "the person or entity . . . whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10).  The plain text of the two definitions establishes that the definitions are in fact different, and the FCC's purported contrary position accordingly merits little deference from this court.  *See Bidwell*, 685 F.3d at 619; *see also Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000) ("[D]eference is warranted only when the language of the regulation is ambiguous.").

Indeed, deferring to the FCC's letter brief in *Palm Beach Golf Center* would violate a key canon of textual interpretation:  the rule that a court should give effect to all words and phrases in the text at issue.  *Barker v. Chesapeake & Ohio R.R.*, 959 F.2d 1361, 1367 (6th Cir. 1992) ("When interpreting a statute, the court is to give effect to each word of the statute if at all possible.").  This is because deference to the FCC's letter brief would mean accepting that the phrase "the person or entity on whose behalf a facsimile unsolicited advertisement is sent" and the phrase "the person or entity whose goods or services are advertised or promoted in the unsolicited advertisement" are one and the same.  Under such a reading, the entire second phrase would do no work at all, and the FCC would have had no reason to include the phrase in the text of 47 C.F.R. § 64.1200(f)(10).  Granting deference to the FCC would thus violate the rule against creating surplus language, *see Barker*, 959 F.2d at 1367, by ignoring the entire second half of § 64.1200(f)(10)'s definition of "sender."  This renders the assertion in the FCC's letter brief that much less reasonable, and we accordingly need not accept the opinion stated therein.  *See Bidwell*, 685 F.3d at 619.

Siding finally supports its proposed imposition of strict liability under 47 C.F.R. § 64.1200(f)(10) by citing *Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627 (6th Cir. 2015).  In *Imhoff*, this court concluded that § 64.1200(f)(10) applied to the defendant's alleged conduct.  *Id.* at 634.  The court thus held that the defendant was strictly liable for violating the TCPA because it was the entity "whose goods or services [were] advertised or promoted in the unsolicited advertisement."  *Id.* at 634-37.

Siding urges us to follow *Imhoff's* conclusion, but we find *Imhoff* easily distinguishable. In *Imhoff*, the defendant's faxes were transmitted after the August 1, 2006 date on which 47 C.F.R. § 64.1200(f)(10) became effective. *See id.* at 630 (noting that the faxes were sent in November and December of 2006). The situation in *Imhoff* thus presented no concerns about retroactive application of the FCC's revised definition of "sender." As a consequence, the fact that § 64.1200(f)(10) was applicable in *Imhoff* has no relevance to the present case.

Based on the above analysis, the strict-liability standard as set out in the FCC's 2006 regulation does not apply to Alco's conduct. Alco therefore cannot be held liable simply because its goods or services were advertised in the offending faxes.

### 2. *The vicarious-liability standard*

Alco maintains that the only way it can be held liable in this case is under a theory of vicarious liability based on a federal common-law agency relationship between Alco and B2B. Under this standard, Alco contends that it is liable for B2B's broadcasts of the faxes only if Alco (1) granted B2B actual authority to send the faxes, (2) clothed B2B with apparent authority to send the faxes, or (3) subsequently ratified B2B's previously unauthorized sending of the faxes.

The district court accepted Alco's contentions. It rejected Siding's theory of strict liability, concluding instead that Alco "could be held vicariously liable for violations of the TCPA under a broad range of federal common law principles of agency." As explained below, however, vicarious liability and the federal common law of agency do not control the outcome of this case.

In deciding that the vicarious-liability standard applied, the district court relied heavily on *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of America, & the States of California, Illinois, North Carolina, & Ohio for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules*, 28 FCC Rcd. 6574 (2013) [hereinafter, *Dish Network*]. The FCC in that proceeding did not consider the question at issue in the current case, i.e., liability under 47 U.S.C. § 227(b)(1)(C); instead, the FCC considered liability under 47 U.S.C. § 227(b)(1)(B). *See Dish Network*, 28 FCC Rcd. at 6575 & n.7. This latter subsection applies to "seller[s]" and "telemarketer[s]." *See* 47 C.F.R. § 64.1200(f)(9), (11). It prohibits

those entities from "initiat[ing] any telephone call to any residential telephone line using an artificial or prerecorded voice . . . without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(B).  The FCC in *Dish Network* ultimately concluded that persons "may be held vicariously liable for certain third-party telemarketing calls . . . under federal common law principles of agency."  28 FCC Rcd. at 6584.

In the present case, the district court concluded that liability under 47 U.S.C. § 227(b)(1)(C) (for faxes such as those that B2B transmitted) should be treated similarly to liability under 47 U.S.C. § 227(b)(1)(B) (for telephone calls such as those at issue in *Dish Network*).  The court stated in particular that "*Dish Network* stands for the proposition that a party is not directly liable for a TCPA violation unless [the party] actually transmits a fax, but the party may be vicariously liable under federal common law principles of agency for the actions of a third party."

As this court recently explained, however, the FCC's conclusion in *Dish Network* rested largely on the definitions of the terms "telemarketer" and "seller."  *Imhoff*, 792 F.3d at 635.  But those terms "are not used in the sections of the TCPA and accompanying regulations that apply to unsolicited fax advertisements."  *Id.*  The FCC's *Dish Network* decision is consequently "inapplicable to the fax transmissions at issue here."  *Id.*

The Eleventh Circuit has come to the same conclusion.  In *Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015), the district court had relied on *Dish Network* to conclude that "a person who did not physically transmit a fax [such as Alco in the current case], but rather directed a third party to do so, could be held liable under the TCPA only vicariously under federal common law principles."  *Id.* at 1254.  The Eleventh Circuit disagreed with the district court's conclusion.  Like this court did in *Imhoff*, the Eleventh Circuit noted the distinctions between the statutory and regulatory language applicable to faxes under 47 U.S.C. § 227(b)(1)(C) and to telephone calls under 47 U.S.C. § 227(b)(1)(B).  *See id.* at 1255.  The Eleventh Circuit then concluded that, "because *DISH Network* did not address the TCPA's junk-fax-ban provision, the District Court's reliance on it, to hold that a plaintiff must establish vicarious liability in order to recover under the statute when a third party sends unsolicited fax advertisements on behalf of the advertiser, was misplaced."  *Id.*  *Imhoff* and *Palm*

*Beach Golf Center* together thus explain why the district court in this case should not have relied on the vicarious-liability standard to evaluate Alco's liability.

On the other hand, the Seventh Circuit very recently addressed the vicarious-liability issue in *Bridgeview Health Care Center, Ltd. v. Clark*, No. 816 F.3d 935 (7th Cir. 2016). The court in that case considered who qualifies as a "sender" of an unauthorized fax and concluded that "agency rules are properly applied to determine whether an action is done 'on behalf' of a principal." *Id.* at 938. Alco now urges us to adopt this approach and likewise apply the principles of federal common-law agency to determine whether Alco is liable for B2B's actions.

We note, however, that the Seventh Circuit's decision to apply agency law is unsupported by any analysis. *See id.* This is particularly perplexing because the FCC plainly knows how to impose the standards of agency law when it wishes to do so. *See Dish Network*, 28 FCC Rcd. 6574, 6584 (2013) ("[W]e find that the seller may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers."). But the FCC in the *1995 Order* imposed no such standards; indeed, it said nothing whatsoever about agency law or vicarious liability in relationship to fax broadcasters. *See* 10 FCC Rcd. at 12407-08. We therefore respectfully decline to adopt the Seventh Circuit's decision to focus solely on agency principles when the FCC itself has declined to do so. This is not to say that we should ignore all agency principles when assessing liability under the TCPA, *see* Part II.C. below, but the FCC has made clear that, in cases such as the one currently before us, agency law is not the sole standard of liability.

All of this still leaves us, however, with the question of which standard does apply. In *Imhoff*, this court concluded that the previously described strict-liability standard of 47 C.F.R. § 64.1200(f)(10) applied to the defendant's conduct. 792 F.3d at 636 ("Given that *DISH Network* does not have any bearing on the FCC's regulations pertaining to fax transmissions, liability turns on the plain language of the FCC's definition of 'sender' in 47 C.F.R. § 64.1200(f)(10)."). As explained above, however, § 64.1200(f)(10) is inapplicable to this case because that regulation did not become effective until after Alco's alleged violation of the TCPA. We must therefore look to the FCC's standard for imposing liability that was in force at

the time that B2B broadcast the faxes at issue. As we explain below, that standard was the "on-whose-behalf" standard.

### 3. *The "on-whose-behalf" standard*

The FCC addressed liability under the TCPA in its *1995 Order*. There, the FCC first stated the broad principle that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations" of the TCPA. *1995 Order*, 10 FCC Rcd. 12391, 12397. The FCC then specifically addressed fax liability. It stated that "the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements." *Id.* at 12407. Finally, in connection with the *Palm Beach Golf Center* case, the FCC confirmed that the "on-whose-behalf" standard provided the rule for assessing fax liability under the TCPA from the time of the *1995 Order* until the strict-liability standard became effective in August 2006. *See* 781 F.3d at 1254-55 ("As to its pre-2006 treatment of fax advertisements, the FCC cited [the *1995 Order*], which stated that 'the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements.'" (footnote omitted)).

In the present case, the faxes at issue were broadcast in November 2005 and July 2006. These faxes thus fell within the time period during which the FCC applied the "on-whose-behalf" standard, so liability for sending the faxes must be judged by that standard. *See id.* at 1257 ("Because the ['on-whose-behalf' standard] is a reasonable interpretation of Congressional intent under the TCPA and does not conflict with the statute's underlying legislative history, we must defer to the [FCC's] construction of the statute."); *accord, Cin-Q Auto., Inc. v. Buccaneers Ltd. P'ship*, No. 8:13-CV-01592-AEP, 2014 WL 7224943, at *4 n.1 (M.D. Fla. Dec. 17, 2014) (noting that a claim asserting an unauthorized fax transmission "was governed by [the *1995 Order*], as the action accrued in 2005—preceding the 2006 regulation"). We will therefore apply the "on-whose-behalf" standard to determine whether summary judgment in favor of Alco was warranted.

**C.     Relevant factors under the "on-whose-behalf" standard**

As explained above, the Eleventh Circuit in *Palm Beach Golf Center* concluded that the "on-whose-behalf" standard applies to fax transmissions sent between the effective date of the *1995 Order* and the August 1, 2006 effective date of the new definition of "sender." 781 F.3d at 1254.    That court, in doing so, rejected both the strict-liability standard of 47 C.F.R. § 64.1200(f)(10), *see id.* at 1254 n.9, and the vicarious-liability standard based on the federal common law of agency, *id.* at 1255.   The "on-whose-behalf" standard thus exists as a middle ground between strict liability and vicarious liability.

This means that a plaintiff alleging a violation of 47 U.S.C. § 227(b)(1)(C) on the basis of a fax transmitted between the time of the *1995 Order* and August 1, 2006 must do more than simply show that the defendant's goods or services were advertised in the offending fax, but need not establish a complete agency relationship between the defendant and the fax broadcaster. *See Cin-Q Auto.*, 2014 WL 7224943, at *7 ("'[O]n whose behalf' is a standard lying somewhere in the middle—more forgiving than a blanket application of *per se* liability but somewhat more stringent than vicarious liability through common law agency.").

To decide whether one entity (such as B2B in this case) broadcast a potentially unauthorized fax "on behalf of" another entity (such as Alco in this case), courts have considered a variety of factors.   These factors include the degree of control that the latter entity exercised over the preparation of the faxes, whether the latter entity approved the final content of the faxes as broadcast, and the nature and terms of the contractual relationship between the fax broadcaster and the latter entity.  *See Palm Beach Golf Ctr.*, 781 F.3d at 1258 (discussing the evidence that precluded summary judgment on facts similar to those in the present case).   One court has summarized the "on-whose-behalf" inquiry as follows:

> Circumstances to be considered include, but are not limited to, the degree of input and control over the content of the fax(es), the actual content of the fax(es), contractual or expressly stated limitations and scope of control between the parties, privity of the parties involved, approval of the final draft of the fax(es) and its transmission(s), method and structure of payment, overall awareness of the circumstances (including access to and control over facsimile lists and transmission information), and the existence of measures taken to ensure compliance and/or to cure non-compliance with the TCPA.

*Cin-Q Auto*, 2014 WL 7224943, at *7. Another court has recently agreed that these are appropriate factors in determining whether a fax was sent on behalf of another entity. *See City Select Auto Sales, Inc. v. BMW Bank of N. Am. Inc.*, No. CV 13-4595 (NLH/JS), 2015 WL 5769951, at *11 (D.N.J. Sept. 29, 2015) (citing factors such as whether the defendant entity "specifically authoriz[ed]" the transmission of the faxes or "[took] immediate action to ensure that no further [unauthorized] solicitations went out").

These courts have applied the above-described factors with an eye toward Congress's intent in passing the fax-related provisions of the TCPA. In particular, Congress intended to stop fax advertisers from (1) coopting advertisement recipients' fax machines in a way that interferes with legitimate business uses, and (2) shifting advertising costs from the sender of the fax to the recipient of the fax. *Palm Beach Golf Ctr.*, 781 F.3d at 1257. Courts have therefore applied the "on-whose-behalf" standard in a way that targets the entity primarily responsible for such conduct. *Id.* (approving the "on-whose-behalf" standard because it "place[s] liability at the source of the offending behavior that Congress intended to curtail"); *see also Cin-Q Auto.*, 2014 WL 7224943, at *7 (observing that the "on-whose-behalf" standard is "aimed at establishing the origin of the offending behavior"). These courts accordingly do not apply the "on-whose-behalf" standard with a layperson's understanding of what that phrase might mean; instead, they treat the phrase "on whose behalf" as a term of art that should be interpreted in a way that seeks to hold liable the entity ultimately at fault in causing a TCPA violation.

Based on the foregoing, the phrase "on-whose-behalf" has been treated as a term of art that blends (1) federal common-law agency principles, such as whether and to what extent one entity controlled the other, and (2) policy considerations designed to address which entity was most culpable in causing a TCPA violation, such as whether and to what extent each entity investigated the lawfulness of the fax broadcasts at issue. We agree that this interpretation of the "on-whose-behalf" standard effectuates Congress's intent in passing the TCPA. Accordingly, we now adopt this interpretation and apply it to the present case.

### 1.  *Factors tending to show that B2B did not act on behalf of Alco*

Several of the factors identified in cases such as *Palm Beach Golf Center* and *Cin-Q Automobiles* indicate that B2B did not act on Alco's behalf.  First, Gajdos testified during his deposition that B2B never provided any details about the list of fax numbers to which it intended to send the faxes advertising Alco's services.  Gajdos added that Alco never received information from B2B about the numbers or businesses to which the faxes actually were transmitted.  Alco therefore had only limited "access to and control over facsimile lists and transmission information," *see Cin-Q Auto.*, 2014 WL 7224943, at *7, with the implication that B2B—rather than Alco—was the entity responsible for sending the faxes to businesses that had not consented to the receipt of the advertisements.

Second, Gajdos testified that, when he received complaints from businesses to which the faxes had been sent, he would call Wilson and notify him of the complaints.  According to Gajdos, Wilson then stated that he "would have to take [the businesses] off his list" and promised that "he would take care of it."  This exchange demonstrates that Alco took "measures . . . to ensure compliance and/or to cure non-compliance with the TCPA," *see id*. at *7, because any violations that occurred after Gajdos's communications with Wilson could reasonably be attributed not to Alco's conduct, but to B2B's failure to carry out Wilson's promises.  B2B in these circumstances was thus potentially responsible for any further TCPA violations that may have occurred.

Next, B2B assured Gajdos that any advertising that B2B conducted would be "100 percent legal" because "[B2B] had a full and open relationship" with each of the potential advertisement recipients.  A factfinder could conclude that Alco reasonably relied on these representations in deciding to enter an advertising arrangement with B2B that Alco believed would not violate the TCPA or any other laws.  And that, in turn, would mean that B2B, rather than Alco, was the actual origin of any conduct that violated the TCPA.  *See id.* at *8 ("A reasonable jury could conclude that [the defendant] relied on reasonable assurances by [the fax broadcasters] . . . .  Such an analysis could lead a rational trier of fact to conclude that the violative faxes were not sent on behalf of [the defendant] but, rather, [the fax broadcasters]—the true sources of the offending behavior.").

Finally, the sample advertisements that Wilson sent to Alco included a legend stating that the message was "the exclusive property of Macaw . . . , which is solely responsible for its contents and destinations." Similarly, the letter that B2B later sent to Alco stated that B2B, rather than Alco, was "solely responsible for the contents and destinations of [the] faxes." These representations could be viewed by a factfinder as tending to show that Alco lacked any significant "input and control over the content of the fax(es)," *id.* at *7, thereby implying that B2B was not acting on behalf of Alco.

### 2. *Factors tending to show that B2B did in fact act on behalf of Alco*

On the other hand, several factors tend to support the conclusion that B2B did in fact act on Alco's behalf. As an initial matter, Gajdos testified during his deposition about the relationship between Alco and B2B. Siding's counsel at that time asked Gajdos whether B2B "actually sent any faxes on behalf of [Alco]." Gajdos responded "Yes," and added that he knew that B2B did so because Alco "got a couple customers out of it."

Siding reads this exchange as an admission that B2B sent the faxes "on behalf of" Alco, arguing that this exchange alone is enough to render summary judgment in favor of Alco inappropriate. We agree that this exchange is probative, but Siding exaggerates the extent of its importance. The phrase "on whose behalf" is, as noted above, a legal term of art. So by asking whether B2B sent any faxes "on behalf of [Alco]," Siding's counsel essentially asked Gajdos to make a legal conclusion that—as a layperson—he was unlikely to understand. Gajdos, in other words, was probably unaware of the legal ramifications of his affirmative response, so we are unwilling to treat his answer in and of itself as sufficient to preclude summary judgment in favor of Alco.

Nonetheless, other evidence supports the conclusion that B2B did in fact act on Alco's behalf. Gajdos, for example, provided information about Alco and three "selling points" for inclusion in the advertisements that B2B prepared. Thus, even though Macaw and B2B later represented that they were "solely responsible" for the contents of the advertisements, Alco evidently did have at least some "degree of input and control," *id.* at *7, over their content.

Next, Alco reviewed and later approved the sample advertisements that B2B prepared. Alco maintains that it approved the sample advertisements on the condition that they be sent only to businesses that had previously consented to receive such advertisements. Indeed, the sample advertisements that Alco reviewed included a disclaimer stating "We will only send faxes to parties who wish to receive them." This implies that B2B deviated from Alco's approval and that B2B was therefore the entity responsible for any violations of the TCPA. Nevertheless, the fact remains that Alco at the very least was substantively involved in the preparation of the advertisements and ultimately approved their content. This factor thus supports a finding that B2B was acting "on behalf of" Alco. *See id.* (citing the "approval of the final draft of the fax(es)" as a relevant consideration).

Alco, moreover, does not dispute that the advertisements in this case promoted its services. This fact, as discussed earlier, is not sufficient to impose strict liability on Alco. *See* Part II.B.1. above. But "the actual content of the fax(es)" is nonetheless a relevant consideration, *see Cin-Q Auto.*, 2014 WL 7224943, at *7, and the fact that the advertisements did promote Alco's business thus weighs in favor of a finding that they were sent on Alco's behalf. *See, e.g.*, *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1258 (11th Cir. 2015) (finding significance in the fact that the advertisement at issue "promot[ed] [the defendant's] services"). Indeed, Gajdos himself testified that Alco obtained several customers from B2B's fax campaign, so Alco's desire to advertise its services seems to have played at least some role in the origin of the allegedly unlawful conduct in this case.

Finally, the district court in ruling on a motion for summary judgment or a jury assessing the evidence at trial may take into account the reasonableness of Alco's reliance on B2B's representations that B2B would be solely responsible for the contents of the advertisements and that the faxes would be sent only to businesses that had previously consented to receive fax advertisements from B2B. The goal, after all, is to determine "the source of the offending behavior that Congress intended to curtail." *Palm Beach Golf Ctr.*, 781 F.3d at 1257. Alco's efforts to determine whether it was dealing with a reputable company or with a fly-by-night outfit is therefore a relevant factor for the court or a jury to consider.

Based on the foregoing, a remand is required for the district court to apply the correct legal standard. The court in doing so may allow further discovery to determine whether, under that standard, a genuine dispute regarding any material fact exists, and the court may in any event conduct such further proceedings as it determines is necessary to effectuate the standard described above. In addition, the court should reconsider whether, after conducting such proceedings, Siding's motion for class certification remains moot.

### III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.